**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

THE EVANGELICAL LUTHERAN
GOOD SAMARITAN SOCIETY, A
NORTH DAKOTA CORPORATION
D/B/A GOOD SAMARITAN SOCIETY-
BETTY DARE,

      Plaintiff,

vs.                                   No. CIV 16-1355 JB/KS

BEATRICE MORENO, DECEASED, BY
THE PERSONAL REPRESENTATIVE OF
THE WRONGFUL DEATH ESTATE,
MONICA CRUZ HATTON

      Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on Plaintiff Evangelical Lutheran Good

Samaritan Society, a North Dakota Company D/B/A Good Samaritan Society-Betty Dare's

("Good Samaritan") Motion to Compel Arbitration and Petition for Appointment of Arbitrator,

filed December 13, 2016 (Doc. 3) and its incorporated Memorandum of Law in Support of

Plaintiff's Motion to Compel Arbitration and Petition for Appointment of Arbitrator, filed

December 13, 2016 (Doc. 4)("Motion to Compel"). The Court held a hearing on May 2, 2017.

The primary issues are: (i) whether, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C.

§§ 1-16, the Court should grant a motion to compel arbitration where a temporary legal guardian

signed a nursing home admission agreement ("Admission Agreement") on behalf of a potential

nursing home resident -- Beatrice Moreno ("Moreno") -- that contained a "Resolution of Legal

Disputes'" ("Arbitration Agreement") provision delegating to the arbitrator the "exclusive

authority to resolve any disputes related to the existence and/or enforceability" of the Arbitration

Agreement; (ii) whether the Court should compel discovery regarding the temporary legal guardian's authority to bind the Moreno to the Arbitration Agreement; and (iii) whether Defendant Monica Cruz Hatton, the personal representative of the wrongful death estate of Beatrice Moreno ("Hatton") is bound to arbitrate her claims. The Court concludes that: (i) it will compel arbitration, because Defendant Monica Cruz Hatton, the personal representative of the wrongful death estate of Beatrice Moreno ("Hatton") never specifically challenged the temporary legal guardian's authority to agree to the delegation clause or the delegation clause's unconscionability; (ii) it will, consequently, not compel discovery, because the temporary legal guardian's authority is an issue for the arbitrator; and (iii) if it could consider whether Hatton is bound to the entire Arbitration Agreement, it would determine that she is. Accordingly, the Court grants the Good Samaritan's Motion to Compel.

## FACTUAL BACKGROUND

Good Samaritan owns and operates a nursing home in Alamogordo, New Mexico. See Complaint to Compel Arbitration and Petition for Appointment of Arbitrator ¶ 1 at 1, filed December 13, 2016 (Doc. 1)("Complaint"). On February 27, 2014, Good Samaritan admitted Moreno into that nursing home, and she lived there until her death on August 26, 2015. See Complaint ¶¶ 8, 19, at 2, 5; Motion to Compel at 1. Also on February 27, 2014, the Twelfth Judicial District, County Court of Otero of the State of New Mexico, appointed SM Gantz OT Services, Inc. ("SM Gantz") Moreno's temporary guardian. See Complaint ¶ 6, at 2. As temporary guardian, SM Gantz received a Letter of Temporary Guardianship that authorized SM Gantz to make decisions regarding Moreno's "medical and psychiatric care, residential placement, safety, and supervision." See Complaint ¶ 7, at 2. When Moreno entered the nursing home, SM Gantz, acting as her legal temporary guardian, reviewed and signed the Good

Samaritan Admission Agreement on Moreno's behalf. See Complaint ¶ 8, at 2-3; Good Samaritan Society Admission Agreement at 14-15 [at 22-23 on CM/ECF](dated February 27, 2014), filed December 13, 2016 (Doc. 1-1)("Admission Agreement"). The Admission Agreement contains an Arbitration Agreement that gives the resident or his or her legal representative the option to agree to arbitrate disputes or to elect not to arbitrate disputes. See Admission Agreement at 13-14 [at 21-22 on CM/ECF]; Complaint ¶¶ 10-11, at 3. If a resident or legal representative elects to arbitrate, the Admission Agreement explains that the resident is electing to waive his or her right to sue in a court of law and to a trial by jury. See Complaint ¶ 15, at 4; Admission Agreement at 13 [at 21 on CM/ECF]. SM Gantz elected to arbitrate disputes on Moreno's behalf. See Complaint ¶ 18, at 5; Admission Agreement at 14 [at 22 on CM/ECF].

The Arbitration Agreement contains several other relevant clauses. See Complaint ¶¶ 13-17, at 3-5. Paragraph A provides: "Any legal controversy, dispute, disagreement or claim arising between the Parties hereto . . . in which Resident, or a person acting on his or her behalf, alleges a violation of any right granted Resident under law or contract shall be settled exclusively by binding arbitration." Admission Agreement at 13 [at 21 on CM/ECF]; Complaint ¶ 13, at 3. Paragraph B states:

> Any legal controversy, dispute or claim of any kind arising out of or related to this Admission agreement, or the breach thereof, or, related to the care of stay at the Facility, shall be settled exclusively by binding arbitration . . . This arbitration clause is meant to apply to all controversies, disputes, disagreements or claims including, but not limited to, all breach of contract claims, all negligence and malpractice claims, all tort claims and all allegations of fraud concerning entering into or canceling this Admission Agreement. This arbitration provision binds all parties whose claims may arise out of or relate to treatment or service provided by the center including any spouse or heirs of the Resident.

Admission Agreement at 13 [at 21 on CM/ECF]; Complaint ¶ 14, at 4. Paragraph C contains

several clauses, but in relevant part it states:

> The Parties shall work together in good faith to select a mutually agreeable individual arbitrator or a national recognized arbitration service provider. . . . The issue of whether a Party's claim(s) is subject to arbitration under this . . . provision shall be decided by the arbitrator. . . . [T]he Arbitrator shall have exclusive authority to resolve any disputes related to the existence and/or enforceability of this . . . provision, including but not limited to any claim that all or any part of this . . . provision is void or voidable.

Admission Agreement at 13-14 [at 21-22 on CM/ECF]; Complaint ¶¶ 15-16, at 4-5 (emphasis omitted). The Arbitration Agreement further provides that the nursing home regularly engages in transactions involving interstate commerce, that the services provided to residents involve interstate commerce, and that the FAA governs the Arbitration Agreement. See Admission Agreement at 14 [at 22 on CM/ECF]; Complaint ¶ 17, at 5.

After Moreno died on August 26, 2015, Moreno's daughter, Monica Cruz Hatton, was appointed personal representative of Moreno's estate. Hatton subsequently filed a lawsuit in the Twelfth Judicial District Court against Good Samaritan. See Complaint ¶ 20, at 5-6. On November 21, 2016, Hatton filed an amended complaint in state court against Good Samaritan, among other defendants, alleging causes of action for wrongful death, negligence, negligence per se, negligent or intentional misrepresentation, violation of the Unfair Practices Act, and punitive damages. See Complaint ¶ 20-21, at 5-6; First Amended Complaint for Wrongful Death, Negligence, Negligence Per Se, Misrepresentation, Violation of the Unfair Trade Practices Act, and Punitive Damages at 1-22, filed December 13, 2016 (Doc. 1-2)("State Court Action").

## PROCEDURAL BACKGROUND

On December 13, 2016, Good Samaritan filed its Complaint requesting the Court to compel the parties to: (i) arbitrate pursuant to the Admission Agreement's terms; (ii) order Hatton to arbitrate all claims that she brought in the State Court Action against Good Samaritan;

- 4 -

(iii) stay the State Court Action pending resolution of the arbitration process; (iv) stay further proceedings in this action pending the arbitration's conclusion or dismiss the matter without prejudice; and (v) order other proper relief. <u>See</u> Complaint, Prayer for Relief, ¶¶ A-E, at 12. Also on December 13, 2016, Good Samaritan filed its Motion to Compel.

1.   <u>**Good Samaritan's Motion to Compel Arbitration and Petition for Appointment of Arbitrator.**</u>

Good Samaritan's Motion to Compel argues that Hatton's State Court claims must be arbitrated pursuant to the arbitration clauses in the Admission Agreement that SM Gantz signed on Moreno's behalf. <u>See</u> Motion to Compel at 6. First, it argues, the Court must either order the parties to select an arbitrator or to appoint an arbitrator. <u>See</u> Motion to Compel at 6. According to Good Samaritan, the Court's job then is concluded, because the arbitrator will then decide whether Hatton's claims are arbitrable and meritorious. <u>See</u> Motion to Compel at 6. Good Samaritan argues that, if, however, the Court concludes that it will not enforce the clauses delegating authority to the arbitrator to determine arbitrability ("Delegation Clauses"), the Court should, nonetheless, conclude that Hatton's claims fall within the Arbitration Agreement's scope and order the parties to select an arbitrator or appoint one. <u>See</u> Motion to Compel at 6.

Good Samaritan contends that the FAA governs the Arbitration Agreement. <u>See</u> Motion to Compel at 7. It argues that the parties agreed within the Admission Agreement to arbitrate "[p]ursuant to the Federal Arbitration Act" and also agreed that the "Admission Agreement is a transaction involving interstate commerce." Motion to Compel at 7. Good Samaritan, thus, argues under the FAA, this writing and agreement is sufficient to demonstrate the FAA controls the agreement, unless there are reasons in law or equity for revoking a contract. <u>See</u> Motion to Compel at 7. The FAA applies with equal force to wrongful death claims against nursing homes, or other personal injury claims, it argues, because, as the Supreme Court of the United States has

concluded, the FAA's "text includes no exception for personal-injury or wrongful-death claims." Motion to Compel at 8 (quoting <u>Marmet Health Care Ctr., Inc. v. Brown</u>, 565 U.S. 530, 532 (2012)).

Because the FAA applies, Good Samaritan argues that the Court's first task is to compel the parties to select an arbitrator or to appoint one. <u>See</u> Motion to Compel at 8. The Arbitration Agreement specifies that "[t]he Parties shall work together in good faith to select a mutually agreeable individual arbitrator or a nationally recognized arbitration service provider," but, it argues, because Hatton has not responded to Good Samaritan's request to work together to select the arbitrator, the Court must intervene and "compel the parties to work together to select" one. Motion to Compel at 8. Good Samaritan further avers that the FAA requires the Court to appoint an arbitrator when either "1) the method for selecting an arbitrator has not been designated in the agreement, or 2) or [sic] there is a lapse in the naming of the arbitrator." Motion to Compel at 9 (citing 9 U.S.C. § 5.). Good Samaritan argues that, because the FAA's language is mandatory, and because there has been a lapse in naming the arbitrator, the Court must now appoint an arbitrator for the parties. <u>See</u> Motion to Compel at 9.

Regarding the Delegation Clauses, Good Samaritan asserts that it is settled law that "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." Motion to Compel at 9 (quoting <u>Rent-A-Center, W., Inc. v. Jackson</u>, 561 U.S. 63, 68-69 (2010)("<u>Rent-A-Center</u>"). According to Good Samaritan, the Delegation Clauses that provide, "the Arbitrator shall have exclusive authority to resolve any disputes related to the existence and/or enforceability of this Resolution of Legal Disputes Provision" and "[t]he issue of whether a party's claim(s) is subject to arbitration . . . shall be decided by the arbitrator" are

enforceable. Motion to Compel at 9-10 (emphasis omitted); Admission Agreement at 13-14 [at 21-22 on CM/ECF].

If the Court, however, concludes that it will not enforce the Delegation Clauses, Good Samaritan argues that the remaining Arbitration Agreement is "valid and enforceable," and would bind Hatton for several reasons. See Motion to Compel at 10. First, Good Samaritan contends that Moreno's legal guardian's signature binds Hatton to the arbitration clause. See Motion to Compel at 11, 15-18. It argues that the Twelfth Judicial Circuit of New Mexico authorized Moreno's legal guardian -- SM Gantz -- to make medical and psychiatric care and residential placement decisions on Moreno's behalf, and, consistent with that authority, Gantz "was authorized to take all acts necessary to admit [Moreno] to [Good Samaritan]" and could "elect[] arbitration on Ms. Moreno's behalf." See Motion to Compel at 11-12. Good Samaritan contends that if SM Gantz lacked authority to agree to arbitration, SM Gantz' "authority to enter into the Admission Agreement and all other admission forms is equally vulnerable." Motion to Compel at 12. From that assertion Good Samaritan argues that if the entire agreement's validity is challenged, then, under "well-established law," the entire agreement's validity must be "decided by the arbitrator rather than a court." Motion to Compel at 12 (citing Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404 (1967)).

Second, Good Samaritan argues that § 2 of the FAA compels the Court to enforce the Arbitration Agreement. See Motion to Compel at 13. Good Samaritan asserts that the FAA commands the Court to place the arbitration provision on equal footing with the Admission Agreement's remaining provisions and that, if SM Gantz had the authority to enter into the Admission Agreement, he also had "authority to bind Ms. Moreno" to the arbitration clause, and also Hatton as Moreno's estate. Motion to Compel at 13, 15-18 (citing THI of N.M. at Hobbs

Ctr., LLC v. Spradlin, 532 F. App'x 813, 818 (10th Cir. 2013)(unpublished)("[B]ecause [the resident] was bound by the arbitration clause as a third-party beneficiary, the non-signatory, wrongful-death beneficiaries are likewise bound.")). Based on this conclusion, Good Samaritan stresses that the Court cannot require "Good Samaritan to make a special showing of proof" that SM Gantz had specific authority to consent to the arbitration provision; authority to enter into the contract should be sufficient. Motion to Compel at 13.

Third, Good Samaritan argues that even if SM Gantz lacked authority to bind Moreno and Hatton, Hatton is still bound to arbitrate, because Moreno was the Admission Agreement's third-party beneficiary. See Motion to Compel at 14. Good Samaritan asserts that, based on the contract's face, Moreno was the contract's intended beneficiary "both generally by the services rendered . . . and more specifically by the Arbitration Provision itself." Motion to Compel at 14-15. Because Moreno benefited from the Contract, Good Samaritan argues that she "would have been bound to arbitrate." Motion to Compel at 15.

Fourth, Good Samaritan argues that Hatton is equitably estopped "from denying [the arbitration provision's] validity." Motion to Compel at 18. In support of this argument, Good Samaritan cites New Mexico law that equitable estoppel requires a party's detrimental reliance based on another's actions. See Motion to Compel at 18. Good Samaritan contends that it "reasonably relied on Mr. Gantz's court appointed authority to elect (or not) arbitration on Ms. Moreno's behalf," and, based on this reliance, "treated Moreno for a year and a half pursuant to the terms in the Admission Agreement." Motion to Compel at 18. Good Samaritan avers that having, thus, "accepted the benefits afforded to Ms. Moreno," Hatton cannot now "deny the applicability of [the Admission Agreement's] Arbitration Provision." Motion to Compel at 19.

Fifth, Good Samaritan asserts that Hatton's claims all fall underneath the Arbitration

Provision's scope.  See Motion to Compel at 19.  Good Samaritan contends that, because the arbitration provision states that " [a]ny legal controversy, dispute, disagreement or claim of any kind arising out of or related to this Admission agreement, or the breach thereof, or, related to the care of stay at the Facility, shall be settled exclusively by binding arbitration," and because it also compels arbitration for "all controversies . . . including, but not limited to, . . . all negligence and malpractice claims, [and] all tort claims," the arbitration provision compels arbitration for Hatton's wrongful death, negligence, negligence per se, Unfair Practices Act violation, and punitive damages.  Motion to Compel at 20.  Hatton's claims, Good Samaritan argues, clearly constitute "[a]ny legal controversy, dispute, disagreement or claim of any kind . . . related to the care of stay at the Facility."  Motion to Compel at 20.

Finally, Good Samaritan asserts that, if the Court compels arbitration it must stay this proceeding and the State Court Action.  See Motion to Compel at 20.  According to Good Samaritan, pursuant to the FAA, a court must, "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had."  Motion to Compel at 20 (quoting 9 U.S.C. § 3)(emphasis omitted).  Good Samaritan argues, accordingly, that the Court must stay the action in federal court once it compels arbitration.  See Motion to Compel at 20.  Good Samaritan also argues that the All Writs Act, 28 U.S.C. §§ 1651-59, and the Anti-Injunction Act, 28 U.S.C. § 2283 permit the Court to enjoin the State Court action "to protect or effectuate its decision to compel arbitration."  Motion to Compel at 20.

**2.      Hatton's  Response to Good Samaritan's Motion to Compel.**

Hatton responded on January 9, 2017.  See Defendant's Response to Plaintiff's Motion to Compel  Arbitration  and  Petition  for  Appointment  of  Arbitrator,  filed  January  9,  2017

(Doc. 14)("Response"). Hatton argues broadly that the Court, not the arbitrator, has the ability to determine arbitrability despite the Admission Agreement's Delegation Clauses and that, here, the Court should decide that Hatton's claims are not arbitrable, because SM Gantz lacked authority to enter into the Admission Agreement, SM Gantz failed to consult with Moreno before signing the agreement, and the Admission Agreement's arbitration clause is substantively and procedurally unconscionable. <u>See</u> Response at 1-2.

As an initial matter, Hatton argues that, because she contends that "the Arbitration Agreement is unenforceable in its entirety," the Court, not the arbitrator, should decide arbitrability. Response at 6. Hatton explains that, "even though parties can contract to delegate such [arbitrability] decisions to the arbitrator, a delegation within an unenforceable agreement is of no effect." Response at 6 (citing <u>Rupelt v. Laurel Healthcare Providers, LLC</u>, 2013-NMCA-014, ¶ 8, 293 P.3d 902, 906). Accordingly, Hatton argues that, for three reasons, the Arbitration Agreement is unenforceable. <u>See</u> Response at 6.

First, Hatton argues that SM Gantz lacked authority to waive Moreno's constitutional right to a jury trial, so the Arbitration Agreement is unenforceable. <u>See</u> Response at 7. Hatton asserts that, under New Mexico law, the court order granting temporary guardianship limits the temporary guardian's power to what is expressly "specified in the court order." Response at 7 (emphasis omitted)(citing N.M. Stat. Ann § 45-5-310(E); N.M Stat. Ann § 45-5-301.1). Hatton contends that, given this limit on a temporary guardian's power, SM Gantz' guardianship authorizing letter granting SM Gantz the power "to make *only* the decisions regarding . . . medical and psychiatric care, residential placement, safety, and supervision . . . as reasonably necessary to *avoid immediate and irreparable harm*" did not authorize SM Gantz to make decisions that would "waiv[e] Ms. Moreno's constitutional right to a jury trial." Response

at 8 (emphasis in original). According to Hatton, a decision to waive constitutional jury rights "did nothing to address immediate or irreparable harm threatening Ms. Moreno." Response at 8. Hatton further contends that SM Gantz lacked authority, because he was obligated to act in Moreno's best interest, but there is no evidence "as to why this waiver was in Ms. Moreno's best interest." Response at 8.

Second, Hatton argues that the Arbitration Agreement is unenforceable because SM Gantz failed to follow proper procedures to waive Moreno's constitutional rights. <u>See</u> Response at 10. Hatton avers that, under several jurisdictions' caselaw, a guardian must "inquir[e] into the incapacitated person's preferences or, in the absence thereof, such actions must be clearly within the incapacitated person's best interests." Response at 10. Hatton argues that, here, SM Gantz failed to follow proper procedures, because SM Gantz, as "a corporate guardian, routinely signs arbitration agreements . . . and perfunctorily did so here without any investigation into [Moreno's] individual desires or preferences . . . or without any examination [of] her best interests." Response at 12. Hatton argues that, accordingly, even if SM Gantz had the authority to sign the Arbitration Agreement, his failure to inquire into her preference and his failure to investigate into Moreno's best interest "invalidates [SM Gantz'] February 27, 2014 signature on the Arbitration Agreement." Response at 13.

Third, Hatton argues that the Arbitration Agreement is procedurally and substantively unconscionable. <u>See</u> Response at 13. Hatton asserts that the Arbitration Agreement is substantively unconscionable, because it binds "all of [the] residents' most likely claims and reserves [Good Samaritan's] most likely claim for collection of past-due accounts" to the courts. Response at 14 (citing <u>Cordova v. World Finance Corp. of NM</u>, 2009-NMSC-021, ¶¶ 25-32, 208 P.3d 901, 908-10; <u>Rivera v. American General Fin. Servs., Inc.</u>, 2011-NMSC-033, ¶¶ 50-53, 259

P.3d 803, 818-19).  Hatton maintains that although the Admission Agreement does not reference

collection claims, the Arbitration Agreement's scope does not cover collection claims and that

the Admission Agreement's provision covering "late payment charges" references court costs,

thus signaling that Good Samaritan "contemplates . . . going to court" to collect late payments.

Response at 15.  Hatton also argues that the Arbitration Agreement is substantively

unconscionable, because it requires residents to pay for half of both the filing fee and the cost of

an arbitrator -- a prohibitively high amount.  See Response at 16 (citing Green Tree Fin. Corp.-

Ala. V. Randolph, 531 U.S. 79, 90 (2000); Clark v. Renaissance West, LLC, 232 Ariz. 510. ¶ 9-

19, 307 P.3d 77, 79-81 (Ct. App. 2013)).  Hatton further contends that the Arbitration

Agreement's confidentiality clause demonstrates substantive unconscionability, because

confidentiality clauses allow Arbitration Agreement drafters to "accumulate 'institutional

knowledge of prior arbitrations,'" whereas potential plaintiffs "cannot obtain precedent or other

prior information," to their detriment.  Response at 17.  Hatton adds that, as a policy matter, the

state has an interest in a "transparent judicial process," so the Court should conclude that the

confidentiality agreement is substantively unconscionable.  See Response at 17.

Hatton also avers that the Arbitration Agreement is procedurally unconscionable, because

it lacks "the specific procedural rules by which an arbitration will be governed."  Response at 17.

According to Hatton, the Arbitration Agreement's provision allowing the parties to agree upon

"the rules of the arbitration service provider" if arbitration occurs, unless the parties cannot

agree, in which case the plaintiff's rules will apply, demonstrates that there are no procedural

rules, making Hatton "unable to determine if the Arbitration Agreement should be rejected for

restricting a resident's ability to prove his or her case."  Response at 17-18.  Hatton argues that,

accordingly, the Agreement's "failure to disclose applicable procedural rules renders it

procedurally unconscionable." Response at 18.

Regarding remedy, Hatton states that, if the Court finds the arbitration provision unconscionable, severing portions of the arbitration clause is inappropriate. See Response at 18. Hatton argues that the "one-sided arbitration provisions are central to the overall arbitration scheme" and, thus, cannot be severed to "save the parties' general agreement to arbitrate." Response at 18 (citing Ruppelt v. Laurel Healthcare Providers, LLC, 2013-NMCA-014, ¶ 20, 293 P.3d 902, 909). Hatton insists that, accordingly, the Court "should strike the Arbitration Agreement in its entirety." Response at 19. Hatton requests, alternatively, "the right to conduct discovery regarding the Arbitration Agreement's enforceability" and for the Court to "hold an evidentiary hearing on the issues presented." Response at 2.

Finally, Hatton refutes several of Good Samaritan's arguments that the Arbitration Agreement is enforceable. Hatton avers that Barron v. The Evangelical Lutheran Good Samaritan Society, 2011-NMCA-094, 265 P.3d 720, which Good Samaritan cites, is inapposite, because that case failed to consider "decisions made by court-appointed guardians for an incapacitated person." Response at 8-9. Hatton argues that, even if the decision is applicable, the case nonetheless allows limitations to be placed on a guardian's authority, and because the guardianship letter did not expand SM Gantz' authority to afford waiver of constitutional rights, the Admission Agreement is still unenforceable. See Response at 9. Hatton further contends that the Arbitration Agreement could not have bound her as a third-party beneficiary, as Good Samaritan argues, because she was a party to the contract and, as a matter of law, parties to a contract cannot be third-party beneficiaries. See Response at 9-10 n.1. Hatton also avers that she is not equitably estopped from challenging the Arbitration Agreement, because she "received no benefits from the arbitration Agreement," Good Samaritan did not reasonably rely on SM

Gantz' authority, because Good Samaritan was responsible for investigating the limits of SM Gantz' power, and Hatton's claims are not based on the Admission Agreement, but on negligence and on state and federal regulations governing nursing facilities.  Response at 10 n.1.

### 3.       Good Samaritan's Reply.

Good Samaritan argues in reply that Hatton failed to attack adequately the Admission Agreement's Delegation Clauses, which, under controlling Supreme Court precedent, means "that this Court 'must treat [the Delegation Clauses] as valid.'"   Reply in Support of Plaintiff's Motion to Compel Arbitration at 1, 3 filed on January 23, 2017 (Doc. 15)("Reply")(citing Rent-A-Center, 561 U.S. at 72).  Good Samaritan insists that state precedent which Hatton cites, see Ruppelt v. Laurel Healthcare Providers, LLC, 2013-NMCA-014, 293 P.3d 902, "does not control the analysis," but rather Rent-A-Center, 561 U.S. at 72, controls, because federal law -- the FAA -- is at issue, Reply at 3.  This federal case, according to Good Samaritan, should end the matter, because the clear-and-unmistakable language in the arbitration clause delegating the arbitrability issue to the arbitrator requires the Court to delegate this issue to an arbitrator.  Reply at 2 (citing Rent-A-Center, W., Inc. v. Jackson, 561 U.S. at 69 n.1).   Good Samaritan also argues that Ruppelt v. Laurel Healthcare Providers, LLC, 2013-NMCA-014, 293 P.3d 902, even if applicable, was about a different issue -- waiver of a delegation argument and that Ruppelt v. Laurel Healthcare Providers, LLC, stands for the proposition that "a district court is precluded from deciding a party's claim of unconscionability unless that claim is based on the alleged unconscionability of the delegation provision itself."  Reply at 3.  Good Samaritan contends that Hatton's remaining arguments about SM Gantz' authority, SM Gantz' procedural oversights, and unconscionability, are irrelevant.  See Reply at 1.

Good Samaritan argues that, even if the Court concludes that it can decide whether SM

Gantz had authority to sign the arbitration provision, SM Gantz had that authority. See Reply at 4. Good Samaritan insists that the Letter of Temporary Guardianship's statement that SM Gantz could make decisions regarding Moreno's medical and psychiatric care, residential placement, safety and supervision encompass "selecting a dispute resolution mechanism." Reply at 4. Hatton's arguments to the contrary, Good Samaritan adds, are unavailing, because the state court's order appointing SM Gantz as guardian signaled that Moreno needed help "managing her property and financial affairs." Reply at 4. Good Samaritan further asserts that the New Mexico guardianship statutes requiring the court order to specify what rights are divested supports Good Samaritan's position, because the "Letters of Temporary Guardianship authorized Mr. Gantz to admit Ms. Moreno to Betty Dare," so, "concomitantly, divested [Moreno] of those rights." Reply at 5. Good Samaritan asserts that, contrary to Hatton's argument that Barron v. Evangelical Lutheran Good Samaritan Soc'y, 2011-NMCA-094, 265 P.3d 720, requires the Court to conclude that SM Gantz lacked authority to waive Moreno's right to a jury trial, "Barron's fundamental holding is that the authority to admit a resident includes the authority to agree to arbitration, even when the resident is unaware of the arbitration agreement." Reply at 6.

Good Samaritan also argues that SM Gantz was not required to observe certain "protocols" before waiving Moreno's right to a jury trial. Reply at 6. According to Good Samaritan, there is no strong presumption in New Mexico against waiving constitutional rights, especially "where, as here, election in favor of arbitration was optional." Reply at 6 (citing Truong v. Allstate Ins. Co., 2008-NMCA-051, ¶¶ 21-25, 182 P.3d 814, rev'd on other grounds, 2010-NMSC-009, 227 P.3d 73). Good Samaritan adds that Hatton's protocol argument is contrary to Barron v. Evangelical Lutheran Good Samaritan Soc'y, 2011-NMCA-094, 265 P.3d 720, because, in that case, an agent "did not have to inquire about the principal's preferences

before waiving a jury trial."  Reply at 7 (citing <u>Barron v. Evangelical Lutheran Good Samaritan</u> <u>Soc'y</u>, 2011-NMCA-094, 265 P.3d 720).  Good Samaritan avers, moreover, that New Mexico guardianship statutes recognize that "a guardian may not be able to know an incapacitated person's 'values,'" so the law does not require SM Gantz to "ascertain Ms. Moreno's preferences prior to electing arbitration."  Reply at 7 (citing NM Stat. Ann. § 45-5-312(B)(3)).  Finally, it argues that the FAA precludes a requirement that SM Gantz follow certain procedures before waiving Moreno's jury right, because that ruling would "place the Arbitration Provision on an unequal footing from the other provisions of the Admission Agreement."  Reply at 8 (citing <u>Allied-Bruce Terminix Cos. Inc. v. Dobson</u>, 513 U.S. 265, 281 (1995)).  Good Samaritan also argues that it is not required to demonstrate that "waiving a jury trial is in [Moreno's] best interest," because it is inconsistent with caselaw concluding that arbitration "generally costs less than litigation and leads to a quicker resolution."  Reply at 8-9 (citing <u>Barron v. Evangelical</u> <u>Lutheran Good Samaritan Soc'y</u>, 2011-NMCA-094, ¶ 41, 265 P.3d at 732).

Good Samaritan finally argues that the arbitration provision is not unconscionable for four reasons.  First, Good Samaritan asserts that the arbitration provision is not one-sided, because the provision covers, among other things, "all other disputes" and "any legal controversy," and, thus "requires both parties to submit all claims to the arbitrator."  Reply at 9-10.  Good Samaritan adds that the reference to court costs in another portion of the agreement makes sense, because the arbitration provision is optional.  <u>See</u> Reply at 9.  Second, Good Samaritan argues that Hatton fails to meet her burden that the arbitration provision's cost sharing is prohibitive or "that she would be prevented from vindicating her rights," because Hatton produced no evidence on the matter.  Reply at 10-11.  In addition, Good Samaritan asserts that the arbitration provision "does not mandate payment of costs," but instead notes that a person

might have to pay a fee, and that "any costs will be shared equally." Reply at 11. Third, Good

Samaritan argues that Hatton has cited no New Mexico caselaw concluding that a confidentiality

agreement can be unconscionable, and stresses here that "[t]he fact specific nature of [Hatton's]

claims make it unlikely that Good Samaritan would obtain an advantage or information that

could benefit it." Reply at 11. Good Samaritan adds that Hatton might benefit from the

confidentiality agreement, because Hatton may be able to keep confidential any medical issues

Moreno had and "the reasons for her placement with Adult Protective services." Reply at 11.

Good Samaritan avers that, if the Court is inclined to hold the cost-sharing or confidentiality

provisions unconscionable, they could be severed, because "they are not so central 'to the

agreement that they are incapable of separation from the agreement to arbitrate.'" Reply at 11

n.6 (quoting Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC, 2013-NMCA-077,

¶ 39, 306 P.3d 480, 494). Fourth, the arbitration provision is not procedurally unconscionable,

according to Good Samaritan, because the parties are required "to agree to a set of rules" and,

thus, the procedure "is reasonable and fair to both sides." Reply at 12 (emphasis omitted). Good

Samaritan adds that procedural unconscionability requires more than just "the absence of rules"

but other "indicia of unconscionability, not present here." Reply at 12 (citing e.g., Lucas v.

Gund, Inc., 450 F. Supp. 2d 1125, 1131 (C.D. Cal. 2006)(Rafeedie, J.).

    **4.**    **The Hearing.**

The Court held a hearing on May 2, 2017. See Draft Transcript of Motion Hearing (taken

May 2, 2017)("Tr.").[1] Good Samaritan opened by noting that the state court had issued a stay in

the State Court Action, and Good Samaritan requested that the Court to enter an order or another

preliminary ruling before August 11, 2017 -- the date the stay expired. See Tr. at 3:12-16; 4:10-

---

[1]The Court's citations to the hearing transcript refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

11 (Bennett).  Based on the state court already entering a stay, Good Samaritan admitted that the stay relief it requests in its Motion to Compel "has been rendered moot."  Tr. at 4:7-9 (Bennett). Good Samaritan requested that the Court should "compel the parties or order the parties to follow the language of the arbitration provision" and to take some time, "perhaps 10 to 14 days, to agree on a mutually acceptable arbitrator," and, if the parties cannot agree, the Court should appoint one.  Tr. at 6:3-10 (Bennett).  Good Samaritan maintained that the threshold issues are the Delegation Clauses in the Arbitration Agreement and that contract formation issues "can be delegated to an arbitrator."  Tr. at 7:20-23 (Bennett).  Good Samaritan acknowledged "the [Supreme] Court has identified some tension between the case law construing delegation clauses, and case law construing the FAA generally," but it thought that a contract's existence and formation were "gateway issues that can be delegated to the arbitrator," and that Good Samaritan's arbitration provision "does delegate those [issues] to the arbitrator."  Tr. 8:3-6; 8:11-17 (Bennett).  After the Court inquired whether there was also a tension between the "general rule that [the] Court has to first determine whether the contract and specifically the arbitration clause are valid," Good Samaritan responded that Rent-A-Center concluded that a court can "sever a delegation clause from an otherwise invalid arbitration provision, and . . . look to the validity [of the] the formation existence of a delegation clause apart from" the rest of the arbitration clause, and, in fact, the FAA requires a court to do that analysis.  Tr. at 8:18-24; 9:4-12 (Bennett, Court).

Regarding whether, as a non-signatory, Hatton is bound, Good Samaritan argued that SM Gantz' "letter of temporary guardianship" grants him "the ability to bind Ms. Moreno."  Tr. at 12:19-23 (Bennett).  Hatton countered that SM Gantz lacked the authority to enter into a voluntary Arbitration Agreement on Moreno's behalf, and that "[t]he circumstances of a

temporary guardian is very limited to the power and authority that he was given under the temporary letters." Tr. at 14:20-23; 17:23-18:1 (Bossie). Reading from the order granting SM Gantz temporary guardianship, Hatton asserted that SM Gantz' "only" authority is to make "decisions regarding medical, psychiatric, residential placement, safety and supervision for Ms. Moreno, as reasonably necessary to avoid immediate and irreparable harm." Tr. at 50:1-8 (Bossie). Hatton argued that, although SM Gantz had authority to make decisions regarding medical care, SM Gantz' authority excluded agreeing to arbitrate, because the Admission Agreement stated at the top: "Resident's agreement to arbitrate dispute is not a condition of admission or a continued stay." Tr. at 15-20 (Bossie)(quoting Admission Agreement at 13 [at 21 on CM/ECF]. Hatton also asserted that caselaw from the Supreme Court of Washington and from California courts supports the contention that SM Gantz lacked authority, because those courts have concluded that a guardian ad litem cannot waive an individual's right to a jury trial without the patient's informed consent. <u>See</u> Tr. at 17:6-14; (Bossie). Hatton doubted that the guardian ever met or talked with Moreno and argued that "there [are] multiple disputed issues of fact that would have to be explored in this case" to determine SM Gantz' authority to enter an Arbitration Agreement, thus, requiring discovery. Tr. at 14:23-15:7 (Bossie). The "bottom-line" for Hatton was that "the Court needs to look at whether the guardian had authority" to sign on Moreno's behalf and that the Court did "not even [have] to get [to] the delegation clause . . . if this is a void null contract," and requested that the Court "deny[] the motion to compel arbitration" or issue an order allowing Hatton "to depose Mr. Gantz" to determine whether SM Gantz had authority to sign for Moreno. Tr. at 20:18-21:6 (Bossie). Hatton added that <u>Barron v. The Evangelical Lutheran Good Samaritan Society</u>, 2011-NMCA-094, 265 P.3d 720, upon which Good Samaritan relied, is inapposite, because the patient there gave "verbal actual and

apparent authority" for her guardian "to sign the documents" so "[Barron v. The Evangelical Lutheran Good Samaritan Society, 2011-NMCA-094, 265 P.3d 720] is not controlling whatsoever to the facts of this case." Tr. at 20:13-17 (Bossie). Whether SM Gantz had authority, Hatton posited, was a question of fact that "would be done by a jury" or that the Court could determine the issue if there is no undisputed facts. Tr. at 21:23-25; 22:3-9 (Bossie).

Good Samaritan rejoined that "[t]here is no need for discovery here," because "Mr. Gantz should be presumed to have acted in Ms. Moreno's best interests" based on the state court's initial determination to appoint him guardian. Tr. 24:15-25:3 (Bennett, Court). Good Samaritan argued that, although there was a "temporary guardianship process" here that "doesn't allow for the same protections as the full guardianship process," the New Mexico statute governing the temporary guardianship process requires the district court to "find that appointing a temporary guardianship is necessary to [] protect the allegedly incapacitated person," which triggers a presumption. Tr. at 26:13-20 (Bennett). Good Samaritan admitted, however, that the FAA provides for a limited hearing when arbitration provisions are at issue, and that "Judge Vazquez . . . held a short sort of abbreviated bench trial" and that type of proceeding would be appropriate. Tr. at 36:10-14 (Bennett).

Good Samaritan also contended that N.M. Stat. Ann. § 45-5-312 -- the statute which Hatton employed to argue that SM Gantz' authority is limited -- grants the guardian the same power "just as a parent [has], vis-à-vis a minor child." Tr. at 27:12-21 (Bennett). According to Good Samaritan, that statute also bestows a guardian the power "to act as a decision maker on [a patient's] behalf" and to "institute proceedings to protect her financial affairs." Tr. at 27:25-28:2 (Bennett). Good Samaritan added that the statute does not suggest that "a guardian has to inquire about an incapacitated person's wishes or desires." Tr. at 30:17-18 (Bennett). Good Samaritan

argued that N.M. Stat. Ann. § 45-5-312's language that "the decision to consent to or withhold treatment shall be made in accordance with the values of the incapacitated person, if known," did not compel a different answer, because the statute "presumes" the guardian's "preexisting knowledge by using the term if known." Tr. at 30:2-10 (Bennett). Good Samaritan also countered Hatton's suggestion that <u>Barron v. The Evangelical Lutheran Good Samaritan Society</u>, 2011-NMCA-094, 265 P.3d 720, is factually inapposite, because the patient there "had no idea that the administration agreement contained an arbitration provision," so the case "holds that there is no requirement that a guardian or an agent [pursue] a [re]quest to determine the principal or the ward's desires." Tr. at 33: 1-15 (Bennett).

Concerning the Delegation Clauses, Hatton maintained her position that those clauses are not a threshold issue, instead asserting that "[the Court] do[es] not even [have] to reach the delegation clause if [the Arbitration Agreement] is a void unenforceable arbitration agreement." Tr. at 18:19-25 (Bossie). Hatton subsequently argued that the Arbitration Agreement as a whole was null and void, so the Court did not have to reach the delegation issue. <u>See</u> Tr. at 22:23-23:1 (Bossie). Hatton conceded that, if she did not persuade the Court that SM Gantz lacked authority to sign on Moreno's behalf that "there is really no issue on the delegation side from [Hatton]." Tr. at 23:19-24:1 (Bossie, Court). Good Samaritan replied that a recent United States Court of Appeals for the Tenth Circuit decision, <u>Belnap v. Iasis Healthcare</u>, 844 F.3d 1272 (10th Cir. 2017), concludes that arbitrability, not the guardian's authority, "is the first question that this Court must address." Tr. at 34:9-18 (Bennett).

Turning to unconscionability, Good Samaritan argued that there is "nothing in the record that demonstrates that the arbitration provision is grossly unfair or grossly burdens the defendants' rights." Tr. at 39:22-24 (Bennett). Good Samaritan maintained its position that the

arbitration provision is not one-sided, because the agreement covers disputes that both the residents and the nursing home bring, and the collection agreement provision mentioning court costs does not suggest otherwise, because residents can opt out of arbitration at signing, so Good Samaritan must otherwise reasonably reserve its court rights.  See Tr. at 40:12-41:2 (Bennett).  Good Samaritan also retained its argument that the fee-sharing provision is not unconscionable, because "the party opposing arbitration has to show with individualized evidence that the cost sharing provision is cost prohibit[ive]," and that Hatton has made no such showing.  Tr. at 42:11-22 (Bennett).  Good Samaritan also preserved its position that the confidentiality agreement is not unconscionable, because it "has benefit to both sides" -- Hatton may want to keep Moreno's medical information private.  Tr. 44:1-7 (Bennett).  Finally, Good Samaritan asserted that there is no procedural unconscionability, because the provision "allows the parties to select the rules" by which the arbitrator must abide and that provision "seems to me to be inherently fair."  Tr. at 44:23-25 (Bennett).

Responding to the unconscionability arguments, Hatton argued that her three arguments "taking all of them together as building blocks . . . rises to the level, based on the law, to be substantively unconscionable."  Tr. at 48:24-49:2 (Bossie).  First, Hatton argued, the Arbitration Agreement's one-sidedness indicates unconscionability, because Good Samaritan drafted its own agreement, and it drafted the collection cost provision mentioning "attorneys' fees and court costs."  Tr. at 46:14-20 (Bossie).   Hatton added that the dispute section mentions specifically claims that will most often only be resident rights claims: negligence, malpractice, tort claims, and fraud.  See Tr. at 47:4-12 (Bossie).  Second, Hatton asserted that the arbitration provision is cost-prohibitive, because "[g]enerally an arbitrator can run from 250 to 350 to 450 per hour . . . , [and that] Moreno's estate . . . doesn't have any money to do that."  Tr. 47:15-20 (Bossie).

Third, Hatton argued that the confidentiality agreement "benefits Good Sam[aritan]," especially in the punitive damages inquiry, because it bars Hatton from obtaining information of widespread harm to other "vulnerable adults." Tr. at 48:5-23 (Bossie). Hatton admitted, however, that the confidentiality clause by itself would not rise to the level of unconscionability. See Tr. at 48:5-7 (Bossie).

Good Samaritan rejoined that the reference to court costs does not necessarily mean that the clause captured only judicial court costs, because "numerous courts . . . have held that arbitrators, just like a court of law, can award attorneys' fees and costs." Tr. at 53:4-7 (Bennett). Good Samaritan argued that, although the arbitration provision mentions specifically some claims, such as breach of contract, negligence, and others, those claims equally applied to residents and the nursing facility, because breach of contract "would cover a collection claim." Tr. at 53:14-19 (Bennett). Good Samaritan averred that, even if Hatton was right about those references to claims applying disproportionately to residents, the FAA preempts that argument, and the Supreme Court of New Mexico has concluded that, "even when there is a chance that another party is [the] most likely party to bring a certain claim, that in and of itself does not render that provision substantively unconscionable." Tr. 54:1-10 (Bennett). Turning to cost-sharing, Good Samaritan contended that there is no evidence to suggest that Hatton could not pay for arbitration and what evidence exists does not support a cost-burden inference, because there is no record how much the Estate has and "we actually don't know how much the arbitration is going to cost." Tr. at 54:11-55:3 (Bennett, Court). According to Good Samaritan, "the parties have control over how much" the arbitration will cost, because the parties select the arbitrator and the rules. Tr. at 55:3-9 (Bennett).

Finally, turning back to SM Gantz' authority, Good Samaritan argued that the temporary

guardian statute's language about avoiding irreparable and immediate harm does not limit the guardian's authority, because that language "is the judicial prerequisite to finding and appointing a temporary guardian," so "that [language] should [not] be read as any limit on [SM Gantz'] authority."  Tr. at 58:18-24 (Bennett).  Good Samaritan asserted, again, that Barron v. The Evangelical Lutheran Good Samaritan Society, supports this conclusion, and that the Court should follow this Court of Appeals of New Mexico's decision, because it is "based on foundational principles of agency law," and that the Court should defer to a state court decision on state law.  Tr. at 60:22-61:18 (Bennett).

## LAW REGARDING ARBITRATION AGREEMENTS

### 1.    Federal law.

"The FAA reflects the fundamental principle that arbitration is a matter of contract." Rent-A-Center 561 U.S. at 67.  "[T]he basic purpose of the Federal Arbitration Act is to overcome courts' refusals to enforce agreements to arbitrate."  Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 270 (1995).  "The FAA thereby places arbitration agreements on an equal footing with other contracts, and requires courts to enforce them according to their terms." Rent-A-Center, West, Inc. v. Jackson, 561 U.S. at 67-68.

Under § 4 of the FAA, a party "aggrieved" by the another party's failure "to arbitrate under a written agreement for arbitration" may petition a federal court "for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  If a party is aggrieved by the refusal of another to arbitrate under a written agreement, the district court, upon petition, "shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the

agreement." 9 U.S.C. § 4. Section 2, the "primary substantive provision of the Act," Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983), provides: "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4." Rent-A-Center, 561 U.S. at 71. "[T]he basis of challenge [must] be directed specifically to the agreement to arbitrate before the court will intervene." Rent-A-Center, 561 U.S. at 71.

The FAA also indicates that, upon a finding that a matter is referable to arbitration, the district court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. Notwithstanding 9 U.S.C. § 3's terms, however, several Courts of Appeal have concluded that "dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable." Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc., 252 F.3d 707, 709-10 (4th Cir. 2001). See Green v. Ameritech Corp., 200 F.3d 967, 973 (6th Cir. 2000)("The weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration."); Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 156 n.21 (1st Cir. 1998); Alford v. Dean Witter Reynolds, Inc., 975 F.2d 1161, 1164 (5th Cir. 1992); Sparling v. Hoffman Constr. Co., 864 F.2d 635, 638 (9th Cir. 1988).

The Tenth Circuit has, correctly, cautioned that, when one of the parties petitions the court to stay an action pending compulsory arbitration, 9 U.S.C. § 3's mandatory language is

binding and that it is error for the court to dismiss the action.  See Adair Bus Sales, Inc. v. Blue Bird Corp., 25 F.3d 953, 955 (10th Cir. 1994).  When, however, the party seeking to compel arbitration requests the court for dismissal, and there is no evidence in the record of any party requesting a stay, it is not error for the district court to dismiss the case.  See Armijo v. Prudential Ins. Co. of Am., 72 F.3d 793, 797 (10th Cir. 1995); Cornoyer v. AT&T Mobility Servs., LLC, No. CIV 15-0474 JB/WPL, 2016 WL 6404853, at *7-8 (D.N.M. Oct. 5, 2016)(Browning, J.).

      **2.**    **New Mexico Law.**

      The New Mexico Uniform Arbitration Act, N.M. Stat. Ann. § 44-7A-7(a) ("NMUAA"), provides that an agreement to submit any controversy arising between the parties to arbitration is "valid, enforceable and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract."  N.M. Stat. Ann. § 44-7A-7(a).  If the court concludes that there is an enforceable agreement to arbitrate, it shall order the parties to arbitrate.  See N.M. Stat. Ann. § 44-7A-8(a).  Where the arbitration provision is disputed, the court's function is to determine whether there is an agreement to arbitrate and to order arbitration where an agreement is found. See N.M. Stat. Ann. § 44-7A-8(a).

      Similar to the federal courts' interpretation of the FAA, New Mexico courts have viewed the NMUAA as an expression of a public policy favoring arbitration.  See United Tech. & Res., Inc. v. Dar Al Islam, 1993-NMSC-005, ¶ 11, 846 P.2d 307, 309 ("The legislature and the courts of New Mexico 'have expressed a strong policy preference for resolution of disputes by arbitration.'"(quoting Dairyland Ins. Co. v. Rose, 1979-NMSC-021, ¶ 14, 591 P.2d 281, 284)). More specifically, New Mexico courts have construed the NMUAA's legislative purpose as an attempt to reduce the court's caseload.  See Bd. of Educ. Taos Mun. Sch. v. Architects, Taos,

1985-NMSC-102, ¶ 10, 709 P.2d 184, 186 ("A concern for preserving scarce judicial resources lies at the heart of the preference for arbitration."); Dairyland Ins. Co. v. Rose, 1979-NMSC-021, ¶ 19, 591 P.2d at 285 (stating that "the legislative intent in enacting the [NMUAA], and the policy of the courts in enforcing it, is to reduce caseloads in the courts, not only by allowing arbitration, but also by requiring controversies to be resolved by arbitration where contracts or other documents so provide"). In New Mexico, when the court concludes that an arbitration agreement exists and is valid, then, in accordance with the NMUAA, the court has a duty to enforce the agreement's provisions and order adherence to that arbitration agreement. See Bernalillo Cty. Med. Ctr. Emps' Ass'n Local 2370 v. Cancelosi, 1978-NMSC-086, ¶¶ 4-5, 587 P.2d 960, 961. Consistent with this understanding, the Supreme Court of New Mexico has interpreted the NMUAA to limit the court's role to determining if an arbitration agreement exists and, if so, to order the parties to arbitration:

> When a broad and general arbitration clause is used, as in this case, the court should be very reluctant to interpose itself between the parties and the arbitration upon which they have agreed. When the parties agree to arbitrate any potential claims or disputes arising out of their relationships by contract or otherwise, the arbitration agreement will be given broad interpretation unless the parties themselves limit arbitration to specific areas or matters. Barring such limiting language, the courts only decide the threshold question of whether there is an agreement to arbitrate. If so, the court should order arbitration. If not, arbitration should be refused.

K.L. House Constr. Co. v. City of Albuquerque, 1978-NMSC-025, ¶ 8, 576 P.2d 752, 754. Accordingly, in New Mexico, parties entering a contract providing for the resolution of disputes through arbitration are bound by their agreement to arbitrate. See Christmas v. Cimarron Realty Co., 1982-NMSC-079, ¶¶ 7-10, 648 P.2d 788, 790.

### 3. **Public Policy Favoring Enforcement of an Arbitration Agreement.**

"There is a strong federal policy encouraging the expeditious and inexpensive resolution of disputes through arbitration." Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1488-89 (10th Cir. 1994). See Southland Corp. v. Keating, 465 U.S. 1, 10 (1984)("Congress declared a national policy favoring arbitration."); Hill v. Ricoh Americas Corp., 603 F.3d 766, 771 (10th Cir. 2010)("[T]he FAA is a 'congressional declaration of a liberal federal policy favoring arbitration agreements.'"(quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983))). Congress enacted the FAA with the express purpose of granting arbitration agreements the same enforceability as any other contract provision. See Volt Info. Sciences, Inc. v. Bd. of Trs., 489 U.S. 468, 474 (1989)(stating that Congress designed the FAA to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and place such agreements upon the same footing as other contracts."). When the applicability of arbitration is in dispute, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985)(quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. at 24-25). New Mexico state courts also view arbitration as a "highly favored" method of resolving disputes, "in part because '[i]t promotes both judicial efficiency and conservation of resources by all parties.'" Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶ 5, 107 P.3d 11, 13 (alteration in original)(quoting Santa Fe Techs., Inc. v. Argus Networks, Inc., 2002-NMCA-030, ¶ 51, 42 P.3d 1221). See Cornoyer v. AT&T Mobility Servs., LLC, 2016 WL 6404853, at *8.

### 4. **Delegation Clauses.**

"[A] delegation provision is an agreement to arbitrate threshold issues concerning the

arbitration agreement." Rent-A-Center, 561 U.S. at 68.    "An agreement to arbitrate a gateway

issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal

court to enforce, and the FAA operates on this additional arbitration agreement just as it does on

any other." Rent-A-Center, 561 U.S. at 70.  The Supreme Court has recognized "that parties can

agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed

to arbitrate or whether their agreement covers a particular controversy." Rent-A-Center, 561

U.S. at 68-69.

A federal court must address who should decide arbitratbility first, before deciding

whether a dispute is arbitrable.  See Belnap v. Iasis Healthcare, 844 F.3d at 1281("[T]he question

of *who* should decide arbitrability precedes the question of *whether* a dispute is arbitrable.");

Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d 1157, 1197

(Browning, J.)("A district court must resolve the question of arbitrability before submitting a

dispute to arbitration.").  When addressing who should decide arbitrability, the Supreme Court

has concluded:

> Section 2 [of the FAA] operates on the specific "written provision" to "settle by
> arbitration a controversy" that the party seeks to enforce. Accordingly, unless
> Jackson challenged the delegation provision specifically, we must treat it as valid
> under § 2 [of the FAA], and must enforce it under § § 3 and 4 [of the FAA],
> leaving any challenge to the validity of the Agreement as a whole for the
> arbitrator.

Rent-A-Center, 561 U.S. at 70.  In other words, if a party "seeks to enforce" a delegation clause,

the opposing party must "challenge[] the delegation provision specifically;" otherwise the court

"must treat [the delegation clause] as valid" and "enforce it" under the FAA.  Rent-A-Center,

West, 561 U.S. at 70.  See also Bio-Tec Environmental, LLC v. Adams, 792 F. Supp. 2d 1208,

1218 (D.N.M. 2011)(Browning, J.).

"'[W]ho has the primary power to decide arbitrability' turns upon what the parties agreed

about *that* matter." Belnap v. Iasis Healthcare, 844 F.3d at 1280 (quoting First Options of Chi.,

Inc. v. Kaplan, 514 U.S. 938, 943 (1995)(emphasis in original)).

> Given that parties can agree to arbitrate arbitrability, as well as other issues, questions of arbitrability encompass two types of disputes: (1) disputes about '*whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement;' and (2) threshold disputes about '*who should have the primary power to decide*' whether a dispute is arbitrable.

Belnap v. Iasis Healthcare, 844 F.3d at 1280 (quoting First Options of Chi., Inc. v. Kaplan, 514

U.S. at 942, 944-45(emphasis in both)). "[W]hen addressing the second type of dispute -- that is,

'when courts decide whether a party has agreed that *arbitrators* should decide arbitrability' --

courts 'should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r]

and unmistakabl[e]' evidence that they did so.'" Belnap v. Iasis Healthcare, 844 F.3d at 1281

(emphasis in original)(quoting First Options of Chi., Inc. v. Kaplan, 514 U.S. at 944 (alteration in

original)).

The clear-and-unmistakable requirement "pertains to the parties' manifestation of intent,

not the agreement's validity." Rent-A-Center, West, Inc. v. Jackson, 561 U.S. at 69 n.1

(emphasis omitted). A contract's validity is whether it "is legally binding, as opposed to whether

it was in fact agreed to -- including of course, whether it was void for unconscionability." Rent-

A-Center, West, Inc. v. Jackson, 561 U.S. at 69 n.1. The Tenth Circuit has stated that, "[o]f

course, the most 'clear and unmistakable' agreement to arbitrate the issue of arbitrability would

be an express statement to that effect in the parties' contractual agreement to arbitrate disputes

arising between them." Dean Witter Reynolds, Inc. v. Howsam, 261 F.3d 956, 968 (10th

Cir.2001), rev'd on other grounds 537 U.S. 79 (2002). The clear-and-unmistakable test typically

turns on the text within the agreement. See Riley Mfg. Co., Inc. v. Anchor Glass Container

Corp., 157 F.3d 775, 780 (10th Cir. 1998); Comm'n Workers of America v. Avaya, Inc., 693

F.3d 1295, 1303 (10th Cir. 2012); Presbyterian HealthCare Servs. v. Goldman, Sachs & Co., 122

F. Supp. at 1197-98 (collecting circuit court opinions); Perez v. Quest Corp., 883 F. Supp. 2d

1095, 1107 (D.N.M. 2012)(Browning, J.).

**5.      Existence of a Valid Arbitration Agreement.**

The Supreme Court has noted that "[a]rbitration is simply a matter of contract between

parties; it is a way to resolve those disputes -- but only those disputes -- that the parties have

agreed to submit to arbitration."   First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943

(1995)(internal citations omitted).   Courts must interpret arbitration clauses liberally, and all

doubts must be resolved in favor of arbitration.   See Hicks v. Cadle, Co., 355 F. App'x 186, 192

(10th Cir. 2009)("We resolve any doubts in favor of arbitrability.")(unpublished)[2](citing Litton

Fin. Printing Div. v. NLRB, 501 U.S. 190, 209 (1991)); Armijo v. Prudential Ins. Co., 72 F.3d

793, 797-98 (10th Cir. 1995)(stating that "questions of arbitrability must be addressed with a

healthy regard for the federal policy favoring arbitration" and that "arbitration clauses must be

interpreted liberally, and any doubts should be resolved in favor of arbitration," and holding that

the plaintiffs had "failed to rebut the presumption of arbitrability.").

While "the presumption in favor of arbitration is properly applied in interpreting the

scope of an arbitration agreement, . . . this presumption disappears when the parties dispute the

---

[2]Hicks v. Cadle and Fundamental Administrative Services, LLC v. Patton, are unpublished Tenth Circuit opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . . However, if an unpublished opinion . . .  has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Hicks v. Cadle and Fundamental Administrative Services, LLC v. Patton have persuasive value with respect to a material issue, and will assist the Court in its preparation of this Memorandum Opinion and Order.

existence of a valid arbitration agreement." Dumais v. Am. Golf Corp., 299 F.3d 1216, 1220 (10th Cir. 2002). See Riley Mfg. Co., Inc. v. Anchor Glass Container Corp., 157 F.3d 775, 779 (10th Cir. 1998)("When the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away."). In the Tenth Circuit, and in New Mexico courts, the "existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." Avedon Eng'g Inc. v. Seatex, 126 F.3d 1279, 1287 (10th Cir. 1997). See K.L. House Constr. Co. v. City of Albuquerque, 1978-NMSC-025, ¶ 8, 576 P.2d at 754 (Stating that "the courts only decide the threshold question of whether there is an agreement to arbitrate. If so, the court should order arbitration."). "Like other contracts . . . [arbitration agreements] may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" Rent-A-Center, West, Inc. v. Jackson, 561 U.S. at 68 (quoting Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996)). See Cornoyer v. AT&T Mobility Servs., LLC, 2016 WL 6404853, at *8-11. Cf. K.L. House Construction Co. v. City of Albuquerque, 1978-NMSC-025, ¶ 8, 576 P.2d at 754 (holding that because a valid arbitration clause existed, the parties had to arbitrate all disputes when the "subject matter of the dispute has a reasonable relationship to the subject matter of the contract").

### LAW REGARDING GUARDIAN APPOINTMENTS AND POWERS

"Appointment of a temporary guardian shall have the effect of limiting the legal rights of the individual as specified in the court order." N.M. Stat. Ann. § 45-5-310(E). "An incapacitated person for whom a guardian has been appointed retains all legal and civil rights except those which have been expressly limited by court order or have been specifically granted to the guardian by the court." N.M. Stat. Ann. § 45-5-301.1. "A person for whom a limited guardian has been appointed retains all legal and civil rights except those that have been

specifically granted to the limited guardian by the court." N.M. Stat. Ann. § 45-5-312(A).

> A guardian of an incapacitated person has the same powers, rights and duties respecting the incapacitated person that a parent has respecting an unemancipated minor child, except that a guardian is not legally obligated to provide from the guardian's own funds for the incapacitated person and is not liable to third persons for acts of the incapacitated person solely by reason of the guardianship.

N.M. Stat. Ann. § 45-5-312(B). The New Mexico Legislature has enumerated the following

power that a guardian has "except as modified" by court order:

> [I]f no agent is entitled to make health-care decisions for the incapacitated person under the provisions of the Uniform Health-Care Decisions Act, [N.M. Stat. Ann. § 27-7A-1] then the guardian shall make health-care decisions for the incapacitated person in accordance with the provisions of that act. In exercising health-care powers, a guardian may consent or withhold consent that may be necessary to enable the incapacitated person to receive or refuse medical or other professional care, counsel, treatment or service. That decision shall be made in accordance with the values of the incapacitated person, if known, or the best interests of the incapacitated person if the values are not known.

N.M. Stat. Ann. § 45-5-312(B)(3). Under the New Mexico United Health Care Act, an "agent"

is "an individual designated in a power of attorney for health care to make a health-care decision

for the individual granting the power," and a "health-care decision" is "a decision made by an

individual or the individual's agent, guardian or surrogate, regarding the individual's health care,

including:"

> (1) selection and discharge of health-care practitioners and institutions;
>
> (2) approval or disapproval of diagnostic tests, surgical procedures, programs of medication and orders not to resuscitate;
>
> (3) directions relating to life-sustaining treatment, including withholding or withdrawing life-sustaining treatment and the termination of life support; and
>
> (4) directions to provide, withhold or withdraw artificial nutrition and hydration and all other forms of health care[.]

N.M. Stat. Ann. § 27-7A-1(B);(G)(1)-(4).

## LAW REGARDING THIRD PARTY BENEFICIARIES

As a general rule, "one who is not a party to a contract cannot maintain suit upon it." Fleet Mortgage Corp. v. Schuster, 1991-NMSC-046, ¶ 4, 811 P.2d 81, 82. Despite this general rule, a third party may be a beneficiary of a contract, and may, as a beneficiary, have enforceable rights against another party to the contract. See Fleet Mortgage Corp. v. Schuster, 1991-NMSC-046, ¶ 4, 811 P.2d at 82. "There are two classes of third-party beneficiaries: intended beneficiaries and incidental beneficiaries." Tarin's Inc. v. Tinley, 2000-NMCA-048, ¶ 13, 3 P.3d 680, 685-86. The Supreme Court of New Mexico has explained:

> A third-party may have an enforceable right against an actual party to a contract if the third-party is a beneficiary of the contract. A third-party is a beneficiary if the actual parties to the contract intended to benefit the third-party. The intent to benefit the third-party must appear either from the contract itself or from some evidence that the person claiming to be a third party beneficiary is an intended beneficiary.

Callahan v. New Mexico Federation of Teachers–TVI, 2006-NMSC-010, ¶ 20, 131 P.3d 51, 58 (internal quotations omitted)(citing Fleet Mortgage Corp. v. Schuster, 1991-NMSC-046, ¶¶ 1-4, 811 P.2d at 82-83). See Great American Ins. Co. of New York v. W. States Fire Prot. Co., 730 F. Supp. 2d 1308, 1316 (D.N.M. 2009)(Browning, J.).

> Only intended beneficiaries can seek enforcement of a contract. The promisor must have had reason to know the benefit was contemplated by the promise as one of the motivating causes for entering the contract. The paramount indicator of a third party beneficiary status is a showing that the parties to the contract intended to benefit the third party, either individually or as a member of a class of beneficiaries.

Tarin's Inc. v. Tinley, 2000-NMCA-048, ¶ 13, 3 P.3d at 686 (internal quotations and citations omitted). "The burden is on the person claiming to be a third-party beneficiary to show that the parties to the contract intended to benefit him." Fundamental Administrative Services, LLC v.

Patton, 504 F. App'x 694 (10th Cir. 2012)(quoting <u>Tarin's, Inc. v. Tinley</u>, 2000-NMCA-048, ¶ 13, 3 P.3d at 686).

**LAW REGARDING NEW MEXICO'S UNCONSCIONABILITY DEFENSE TO CONTRACT ENFORCEMENT**

In New Mexico, "unconscionability is an affirmative defense to contract enforcement." <u>Strausberg v. Laurel Healthcare Providers, LLC</u>, 2013-NMSC-032, ¶ 3, 304 P.3d 409, 412. Consequently, "[c]ourts may render a contract or portions of a contract unenforceable under the equitable doctrine of unconscionability when the terms are 'unreasonably favorable to one party while precluding a meaningful choice of the other party.'" <u>Dalton v. Santander Consumer USA, Inc.</u>, 2016-NMSC-035, ¶ 6, 385 P.3d 619, 621 (alteration added)(quoting <u>Cordova v. World Fin. Corp. of N.M.</u>, 2009-NMSC-021, ¶ 21, 208 P.3d 901, 907).

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

N.M. Stat. Ann. § 55-2-302(1). The party asserting an unconscionability defense "bears the burden of proving that a contract or a portion of a contract should be voided as unconscionable." <u>Dalton v. Santander Consumer USA, Inc.</u>, 2016-NMSC-035, ¶ 7, 385 P.3d at 621 (citing <u>Strausberg v. Laurel Healthcare Providers, LLC</u>, 2013-NMSC-032, ¶¶ 24, 39, 48, 304 P.3d at 415). "The burden of proving unconscionability refers only to 'the burden of persuasion, i.e., the burden to persuade the factfinder' and not 'the burden of production, i.e., the burden to produce evidence.'" <u>Dalton v. Santander Consumer USA, Inc.</u>, 2016-NMSC-035, ¶ 7, 385 P.3d at 621 (quoting <u>Strausberg v. Laurel Healthcare Providers, LLC</u>, 2013-NMSC-032, ¶ 24, 304 P.3d at 415).

"A contract can be procedurally or substantively unconscionable." Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 7, 385 P.3d at 621 (citing Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 21, 208 P.3d at 907). See Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 20, 188 P.3d 1215, 1221 ("The classic articulation of unconscionability is that it is comprised of two prongs: substantive unconscionability and procedural unconscionability.")(citing 7 Joseph M. Perillo, Corbin on Contracts § 29.4, at 388 (2002 ed.)). "Substantive unconscionability relates to the content of the contract terms and whether they are illegal, contrary to public policy, or grossly unfair." Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 20, 188 P.3d at 1221 (citing Padilla v. State Farm Mut. Auto. Ins. Co., 2003-NMSC-011, ¶ 14, 68 P.3d 901, 907; Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d 675, 679, disapproved of on other grounds by Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 31, 208 P.3d at 909). "Procedural unconscionability," by contrast, "is determined by analyzing the circumstances surrounding the contract's formation, such as whether it was an adhesive contract and the relative bargaining power of the parties." Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 20, 188 P.3d at 1221 (citing Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d at 679).

"'The weight given to procedural and substantive considerations varies with the circumstances of each case.'" Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 20, 188 P.3d at 1221 (quoting Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d at 679). "While there is a greater likelihood of a contract's being invalidated for unconscionability if there is a combination of both procedural and substantive unconscionability, there is no absolute requirement in our law that both must be present to the same degree or that they both be present at all." Cordova v. World Fin. Corp. of NM, 2009-NMSC-021, ¶ 24, 208 P.3d at 908 (citing

Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 22, 188 P.3d at 1221 (invalidating an arbitration clause without a finding of procedural unconscionability where "there has been such an overwhelming showing of substantive unconscionability"); Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d at 679; 7 Joseph M. Perillo, Corbin on Contracts § 29.1, at 377 (ed. 2002)(observing that there is "no basis in the text" of Article 2 of the Uniform Commercial Code for concluding that the defense of unconscionability cannot be invoked unless the contract or clause is both procedurally and substantively unconscionable). Moreover, "[p]rocedural and substantive unconscionability often have an inverse relationship[:] The more substantively oppressive a contract term, the less procedural unconscionability may be required for a court to conclude that the offending term is unenforceable." Cordova v. World Fin. Corp. of NM, 2009-NMSC-021, ¶ 24, 208 P.3d at 908 (alteration added)(citing Circuit City Stores, Inc. v. Mantor, 335 F.3d 1101, 1106 (9th Cir. 2003); 1 E. Allan Farnsworth, Farnsworth on Contracts § 4.28, at 585 (3d ed. 2004)("A court will weigh all elements of both substantive and procedural unconscionability and may conclude that the contract is unconscionable because of the overall imbalance.")).

1.      **Procedural Unconscionability.**

"Procedural unconscionability may be found where there was inequality in the contract formation." State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d 658, 669 (citing Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 23, 208 P.3d at 907-08). A contract is procedurally unconscionable "only where the inequality is so gross that one party's choice is effectively non-existent." Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 18, 709 P.2d at 679. See Bowlin's, Inc. v. Ramsey Oil Co., 1983-NMCA-038, ¶ 22, 662 P.2d 661, 669 (concluding that a contract may be unconscionable if there is "'an absence of meaningful choice

- 37 -

on the part of one of the parties'"(quoting Williams v. Walker-Thomas Furniture Co., 350 F.2d 445, 449 (D.C. Cir. 1965)(Wright, J.))).  Whether a party has meaningful choice is "determined by examining the circumstances surrounding the contract formation[], including the particular party's ability to understand the terms of the contract and the relative bargaining power of the parties." Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d at 679 (internal citations omitted).  Consequently, "[a]nalyzing procedural unconscionability requires the court to look beyond the four corners of the contract and examine factors 'including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other.'"  State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d at 669 (quoting Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 27, 208 P.3d at 907-08).  See City of Raton v. Arkansas River Power Auth., 760 F. Supp. 2d 1132, 1154 (D.N.M. 2009)(Browning, J.)("In analyzing whether a contract or a term in a contract is procedurally unconscionable, New Mexico courts consider several factors, including the use of high pressure tactics, the relative scarcity of the subject matter of the contract, and the relative education, sophistication and wealth of the parties.")(citing Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d at 679).

"When assessing procedural unconscionability, courts should consider whether the contract is one of adhesion." Rivera v. Am. Gen. Fin. Servs., Inc., 2011-NMSC-033, ¶ 44, 259 P.3d 803, 817.  An adhesion contract is a standardized contract that a transacting party with superior bargaining strength offers to a "weaker party on a take-it-or-leave-it basis, without opportunity for bargaining." Rivera v. Am. Gen. Fin. Servs., Inc., 2011-NMSC-033, ¶ 44, 259 P.3d at 817 (citing Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 33, 208 P.3d at 910).  "Adhesion contracts generally warrant heightened judicial scrutiny because the drafting

party is in a superior bargaining position." Rivera v. Am. Gen. Fin. Servs., Inc., 2011-NMSC-033, ¶ 44, 259 P.3d at 817 (citing Wis. Auto Title Loans, Inc. v. Jones, 714 N.W.2d 155, 170 (Wis. 2006)). "Although not all adhesion contracts are unconscionable, an adhesion contract is procedurally unconscionable and unenforceable 'when the terms are patently unfair to the weaker party.'" Rivera v. Am. Gen. Fin. Servs., Inc., 2011-NMSC-033, ¶ 44, 259 P.3d at 817 (quoting Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 33, 208 P.3d at 910).

For example, in State ex rel. King v. B & B Investment Group, Inc., the Supreme Court of New Mexico decided whether loan contracts offered by certain payday lenders were unconscionable. See 2014-NMSC-024, ¶ 27, 329 P.3d at 669-70. The Supreme Court of New Mexico concluded that substantial evidence supported "the finding of procedural unconscionability as understood in common law." 2014-NMSC-024, ¶ 27, 329 P.3d at 669-70 The Supreme Court of New Mexico predicated its holding that the loan contracts at issue were procedurally unconscionable on a number of facts regarding contract formation, including

> the relative bargaining strength and sophistication of the parties is unequal. Moreover, borrowers are presented with Hobson's choice: either accept the quadruple-digit interest rates, or walk away from the loan. The substantive terms are preprinted on a standard form, which is entirely nonnegotiable. The interest rates are set by drop-down menus in a computer program that precludes any modification of the offered rate. Employees are forbidden from manually overriding the computer to make fee adjustments without written permission from the companies' owners: manual overrides will be considered in violation of company policy and could result with . . . criminal charges brought against the employee and or termination.

2014-NMSC-024, ¶ 27, 329 P.3d at 669 (internal quotation marks omitted). The Supreme Court of New Mexico further concluded that, on these facts, the payday loan contracts at issue were contracts of adhesion, because the "contracts are prepared entirely by Defendants, who have superior bargaining power, and are offered to the weaker party on a take-it-or-leave-it basis." 2014-NMSC-024, ¶ 27, 329 P.3d at 669. The Supreme Court of New Mexico added that,

"although they will not be found unconscionable in every case, an adhesion contract is procedurally unconscionable and unenforceable when the terms are patently unfair to the weaker party." 2014-NMSC-024, ¶ 27, 329 P.3d at 669 (citing <u>Rivera v. Am. Gen. Fin. Servs., Inc.</u>, 2011-NMSC-033, ¶ 44, 259 P.3d at 817).

By contrast, in <u>Bowlin's, Inc. v. Ramsey Oil Co., Inc.</u>, the New Mexico Court of Appeals considered whether a clause requiring a retail gas company to notify its supplier of any delivery shortages within two days of taking delivery was unconscionable. <u>See</u> 1983-NMCA-038, ¶ 23, 662 P.2d at 669. The Court of Appeals of New Mexico addressed the party's understanding, the contract's sophistication, and the possibility of coercion, and concluded that, because the retailer fully understood the contract's term, and because "the contract was entered into between experienced and sophisticated business concerns," there was no reason to find unconscionability. 1983-NMCA-038, ¶ 23, 662 P.2d at 669 (internal quotation marks omitted). The Court of Appeals of New Mexico also noted that unconscionability is more likely to sound as a defense where an individual consumer is concerned, explaining that "[t]he courts have not generally been receptive to pleas of unconscionability by one merchant against another." 1983-NMCA-038, ¶ 21, 662 P.2d at 669 (internal citation omitted). <u>See</u> <u>Thompson v. THI of New Mexico at Casa Arena Blanca, LLC</u>, No. CIV 05-1331 JB/LCS, 2006 WL 4061187, at *9-10 (D.N.M. Sept. 12, 2006)(Browning, J.).

2. <u>**Substantive Unconscionability.**</u>

Substantive unconscionability requires courts "to consider 'whether the contract terms are commercially reasonable and fair, the purpose and effect of the terms, the one-sidedness of the terms, and other similar public policy concerns" to determine "the legality and fairness of the contract terms themselves.'" <u>Dalton v. Santander Consumer USA, Inc.</u>, 2016-NMSC-035, ¶ 8,

385 P.3d at 621 (quoting <u>Cordova v. World Fin. Corp. of N.M.</u>, 2009-NMSC-021, ¶ 22, 208 P.3d at 907).  Accordingly, when examining a contract for substantive unconscionability, courts must "examine the terms on the face of the contract and to consider the practical consequences of those terms."  <u>Dalton v. Santander Consumer USA, Inc.</u>, 2016-NMSC-035, ¶ 8, 385 P.3d at 621-22 (citing <u>State ex rel. King v. B & B Inv. Grp., Inc.</u>, 2014-NMSC-024, ¶ 32, 329 P.3d at 670 ("[S]ubstantive unconscionability can be found by examining the contract terms on their face.")).  "Thus, the party bearing the burden of proving substantive unconscionability need not make any particular evidentiary showing and can instead persuade the factfinder that the terms of a contract are substantively unconscionable by analyzing the contract on its face."  <u>Dalton v. Santander Consumer USA, Inc.</u>, 2016-NMSC-035, ¶ 8, 385 P.3d at 622.

   "When its terms are unreasonably favorable to one party, a contract may be held to be substantively unconscionable."  <u>Monette v. Tinsley</u>, 1999-NMCA-040, ¶ 19, 975 P.2d 361, 365 (citing <u>State ex rel. State Highway Transp. Dep't v. Garley</u>, 1991-NMSC-008, 806 P.2d 32, 39; <u>Guthmann v. La Vida Llena</u>, 1985-NMSC-106, ¶ 23, 709 P.2d 675, 680).  "However, the threshold for such a holding is very high, as the terms must be such as, no man in his senses and not under delusion would make on the one hand, and . . . no honest and fair man would accept on the other."  <u>Monette v. Tinsley</u>, 1999-NMCA-040, ¶ 19, 975 P.2d at 365 (alteration original)(internal quotations omitted).  The Supreme Court of New Mexico noted in <u>Guthmann v. La Vida Llena</u>:

> In determining reasonableness or fairness, the primary concern must be with the terms of the contract considered in light of the circumstances existing when the contract was made. The test is not simple, nor can it be mechanically applied. The terms are to be considered "in the light of the general commercial background and the commercial needs of the particular trade or case." Corbin suggests the test as being whether the terms are "so extreme as to appear unconscionable according to the mores and business practices of the time and place."

1985-NMSC-106, ¶ 23, 709 P.2d at 680 (quoting <u>Bowlin's, Inc. v. Ramsey Oil Co.</u>, 1983-NMCA-038, ¶ 22, 662 P.2d at 669).  Further, for a court to hold that a contract is substantively unconscionable, the court must conclude that one or more of the contract's terms was grossly unfair "at the time the contract was formed."  <u>Guthmann v. La Vida Llena</u>, 1985-NMSC-106, ¶ 24, 709 P.2d at 680.

With respect to arbitration agreements specifically, the Supreme Court of New Mexico has held that arbitration agreements are substantively unconscionable and thus unenforceable where the arbitration agreement contains a unilateral carve out that explicitly exempts from mandatory arbitration those judicial remedies that a lender is likely to need, while providing no such exemption for the borrower.  See <u>Rivera v. American General Financial Services, Inc.</u>, 2011-NMSC-033, ¶¶ 51-54, 259 P.3d at 818-19; <u>Cordova v. World Fin. Corp. of N.M.</u>, 2009-NMSC-021, ¶ 32, 208 P.3d at 907-10.  In <u>Cordova v. World Finance Corporation of New Mexico</u>, for example, the Supreme Court of New Mexico stated that "[c]ontract provisions that unreasonably benefit one party over another are substantively unconscionable."  2009-NMSC-021, ¶ 25, 208 P.3d at 908.  In that case, a loan contract included a purportedly bilateral arbitration clause containing a unilateral carve-out provision that exempted the lender from mandatory arbitration when the lender sought remedies, "including[,] but not limited to, judicial foreclosure or repossession" in the event of a default by the borrower.  <u>Cordova v. World Fin. Corp. of N.M.</u>, 2009-NMSC-021, ¶ 3, 208 P.3d at 904 (internal quotation marks omitted).  The Supreme Court of New Mexico held that the arbitration clause was "grossly unreasonable" and against New Mexico public policy, because the agreement required require the borrower to arbitrate any of the borrower's claims while reserving to the lender "the exclusive option of seeking its preferred remedies through litigation."  <u>Cordova v. World Fin. Corp. of N.M.</u>, 2009-

NMSC-021, ¶ 20, 208 P.3d at 907.  Accordingly, the Supreme Court of New Mexico held that the arbitration agreement was substantively unconscionable.  Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 32, 208 P.3d at 910.

Next, in Rivera v. American General Financial Services, Inc., the Supreme Court of New Mexico confronted a similar loan contract in which an arbitration agreement required the borrower to arbitrate any claims against the lender while exempting from mandatory arbitration the lender's "self-help or judicial remedies" concerning the property securing the transaction and any claims that the lender might have "[i]n the event of a default."  2011-NMSC-033, ¶ 3,  259 P.3d at 807-08.  As in Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 32, 208 P.3d at 910, in Rivera v. American General Financial Services, Inc., the Supreme Court of New Mexico again held that an arbitration agreement is substantively unconscionable, because the arbitration clause allowed the lender to "retain[] the right to obtain through the judicial system the only remedies it [is] likely to need," while "forcing [the borrower] to arbitrate any claim she may have."  2011-NMSC-033, ¶ 53, 259 P.3d at 818-19.  Accordingly, the Supreme Court of New Mexico held that the arbitration agreement was unreasonably one-sided and, therefore, unenforceable qua substantively unconscionable.  Rivera v. American General Financial Services, Inc., 2011-NMSC-033, ¶ 54, 259 P.3d at 818-19.

By contrast, in Dalton v. Santander Consumer USA, Inc., the Supreme Court of New Mexico held that an arbitration agreement between a lender and a borrower that included a bilateral exception for small claims less than $10,000.00 was not substantively unconscionable, "even if one party is substantively more likely to bring small claims actions . . . ."  2016-NMSC-035, ¶ 21, 385 P.3d at 624.  See 2016-NMSC-035, ¶ 22, 385 P.3d at 625 ("We are hesitant to adopt a holding that might discourage bilateral small claims carve-outs, and thereby curtail the

availability of small claims proceedings to New Mexico consumers . . . .").  The Supreme Court of New Mexico stated that "[g]ross unfairness is a bedrock principle of our unconscionability analysis," 2016-NMSC-035, ¶ 21; 385 P.3d at 624, and refused to conclude that an arbitration agreement that exempts, for both parties, claims less than $10,000.00 from mandatory arbitration is either unreasonably one-sided or grossly unfair, see 2016-NMSC-035, ¶¶ 21-25; 385 P.3d at 624-25.  See also Thompson v. THI of New Mexico at Casa Arena Blanca, LLC, 2006 WL 4061187, at *10.

## ANALYSIS

The Admission Agreement contains clear-and-unmistakable language delegating authority to the arbitrator to determine "whether a Party's claim(s) is subject to arbitration," and "to resolve any disputes related to the existence and/or enforceability of this Resolution of Legal Disputes Provision."  Admission Agreement at 13-14 [at 21-22 on CM/ECF].  If a party invokes a clear-and-unmistakable delegation clause before a federal court, the opposing party must challenge the delegation clause's validity specifically, and not the contract's validity generally, to overcome the FAA's command to compel arbitration.  Hatton does not challenge the delegation clause specifically.  Accordingly, the Court will compel arbitration.  Based on that conclusion, the Court cannot properly order discovery on SM Gantz' authority to bind Moreno, because the FAA requires the Court to "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3.  If the FAA did not compel these results, however, the Court would determine that Hatton is bound to the Arbitration Agreement.

# I. HATTON'S CLAIMS ARE SUBJECT TO ARBITRATION, BECAUSE SHE DOES NOT CHALLENGE THE ADMISSION AGREEMENT'S DELEGATION CLAUSES.

SM Gantz, as Moreno's temporary legal guardian, signed an Arbitration Agreement with Good Samaritan that contains the following clauses:

> The issue of whether a Party's claim(s) is subject to arbitration under this Resolution of Legal Disputes provision shall be decided by the arbitrator. . . .
>
> The Parties hereby expressly agree that the Arbitrator shall have exclusive authority to resolve any disputes related to the existence and/or enforceability of this Resolution of Legal Disputes provision, including but not limited to any claim that all or any part of this Resolution of Legal Disputes provision is void or voidable.

Admission Agreement at 13-14 [at 21-22 on CM/ECF]. Some time after signing this agreement, Hatton filed claims against Good Samaritan in state court. See Complaint ¶ 20, at 5-6. Good Samaritan responded by filing its Complaint and its Motion to Compel before the Court. See Complaint ¶¶ 1-41, at 1-12; Motion to Compel at 1. In its Complaint, Good Samaritan invoked the Admission Agreement's Delegation Clauses:

> Pursuant to the Arbitration Provision's valid Delegation Clauses, the order compelling arbitration should confirm that arbitration of all issues, including threshold issues of arbitrability, are delegated to the arbitrator in the first instance. . . . The Delegation Clauses demonstrate that the arbitrator has 'exclusive authority' to resolve disputes relating to the existence and/or enforceability of the Resolution of Legal Disputes provision.

Complaint ¶¶ 29-30, at 8. Its Motion to Compel similarly invokes the Delegation Clauses. See Motion to Compel at 5, 9-10. Hatton challenges the Admission Agreement's validity marshalling arguments that SM Gantz lacked authority to enter into the Admission Agreement, SM Gantz did not follow proper procedures to waive Moreno's jury-trial rights, and the Admission Agreement is otherwise procedurally and substantively unconscionable. See Response at 2.

- 45 -

The initial question before the Court is who should decide whether this dispute is arbitrable. See Belnap v. Iasis Healthcare, 844 F.3d at 1281 ("[T]he question of *who* should decide arbitrability precedes the question of *whether* a dispute is arbitrable.")(emphasis in original). In answering that question, the threshold inquiry is whether there is clear-and-unmistakable evidence that the parties agreed to arbitrate arbitrability. Belnap v. Iasis Healthcare, 844 F.3d at 1281, 1290. The clear-and-unmistakable analysis does not enjoy the presumption in favor of arbitration. Howard v. Ferrellgas Partners, L.P., 748 F.3d 975, 977 (10th Cir. 2014)("[B]efore the [FAA] Act's heavy hand in favor of arbitration swings into play, the parties themselves must *agree* to have their disputes arbitrated.")(emphasis in original). Most contract defenses are not the proper focus of this inquiry, because the clear-and-unmistakable requirement "pertains to the parties' manifestation of intent, not the agreement's validity." Rent-A-Center, 561 U.S. at 69 n.1 (emphasis omitted). A contract's validity means whether it "is legally binding, as opposed to whether it was in fact agreed to -- including of course, whether it was void for unconscionability[]." Rent-A-Center, 561 U.S. at 69 n.1. The Tenth Circuit has stated that, "[o]f course, the most 'clear and unmistakable' agreement to arbitrate the issue of arbitrability would be an express statement to that effect in the parties' contractual agreement to arbitrate disputes arising between them." Dean Witter Reynolds, Inc. v. Howsam, 261 F.3d 956, 968 (10th Cir. 2001), rev'd on other grounds 537 U.S. 79 (2002). Accordingly, the clear-and-unmistakable test typically turns on the text within the agreement. See Riley Mfg. Co., Inc. v. Anchor Glass Container Corp., 157 F.3d 775, 780 (10th Cir. 1998)(Concluding that there is no clear-and-unmistakable evidence where "there is no hint in the text of the clause or elsewhere in the contract that the parties expressed a specific intent" to arbitrate); Comm'n Workers of America v. Avaya, Inc., 693 F.3d 1295, 1303

(10th Cir. 2012); <u>Presbyterian HealthCare Servs. v. Goldman, Sachs & Co.</u>, 122 F. Supp. at

1197-98 (collecting Courts' of Appeals opinions); <u>Perez v. Quest Corp.</u>, 883 F. Supp. 2d 1095,

1107 (D.N.M. 2012)(Browning, J.).  For example, the Tenth Circuit has recently determined the

following language was clear-and-unmistakable evidence of an intent to arbitrate arbitrability:

> Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

<u>Belnap v. Iasis Healthcare</u>, 844 F.3d at 1281, 1284 (emphasis omitted).

The Admission Agreement provides clear-and-unmistakable evidence that the parties

agree to arbitrate arbitrability, because it clearly incorporates an agreement to make arbitrability

subject to arbitration:  "The issue of whether a Party's claim(s) is subject to arbitration under this

Resolution of Legal Disputes provision shall be decided by the arbitrator."   Admission

Agreement at 13 [at 21 at CM/ECF].  <u>See</u> <u>Sadler v. Green Tree Servicing, LLC</u>, 466 F.3d 623,

624 (8th Cir. 2006)(concluding the following language to be clear-and-unmistakable: "Any

controversy concerning whether an issue is arbitrable shall be determined by the arbitrator(s).").

It also provides clear-and-unmistakable evidence that the parties agree to delegate authority to

the arbitrator to decide the arbitration clause's validity.  <u>See</u> Admission Agreement at 14 [at 22

on CM/ECF]("The Parties hereby expressly agree that the Arbitrator shall have exclusive

authority to resolve any disputes related to the existence and/or enforceability of this Resolution

of Legal Disputes provision."). <u>See</u> <u>Jones v. Waffle House Inc.</u>, 866 F.3d 1257, 1267 (11th Cir.

2017)(Concluding the following language is clear-and-unmistakable: "The Arbitrator . . . shall

have the authority to resolve any dispute relating to the interpretation, applicability,

enforceability or formation of this agreement.").

Hatton does not distinctly challenge the Delegation Clauses' language as unclear or mistakable. Hatton's only argument that could address the clear-and-unmistakable threshold is her contention that SM Gantz failed to adhere to proper procedures to waive Moreno's jury trial right. See Response at 10.[3] This argument could potentially pertain to the clear-and-unmistakable requirement, because she argues that "guardians ad litem cannot waive fundamental rights without the consent of the mental patient." Response at 10. See Communication Workers of America v. Avaya, Inc., 693 F.3d 1295, 1303 (10th Cir. 2012)(emphasis added)(suggesting that the clear-and-unmistakable analysis is appropriate where "there was a fact issue regarding the parties' consent to submit to arbitration," but at that stage "[a]ny doubts . . . could have been resolved in favor of arbitration."). Given that the Tenth Circuit in Communication Workers of America v. Avaya, Inc., has suggested that consent may be an appropriate inquiry for the clear- and-unmistakable test, and Hatton's argument could pertain to consent, the Court analyzes Hatton's argument under the clear-and-unmistakable

---

[3]As the Supreme Court has explained, the clear-and-unmistakable requirement "pertains to the parties' manifestation of intent, not the agreement's validity." Rent-A-Center, West, Inc. v. Jackson, 561 U.S. at 69 n.1 (emphasis omitted). Hatton's argument that SM Gantz lacked authority to sign the Arbitration Agreement on Moreno's behalf pertains to contract validity and not to manifestation of intent, because authority relates to binding another to a contract. See Response at 7; Rent-A-Center, 561 U.S. at 69 n.1 ("The validity of a written agreement to arbitrate [means] whether it is legally binding, as opposed to whether it was in fact agreed to -- including of course, whether it was void for unconscionability[].");  Barron v. Evangelical Lutheran Good Samaritan Soc'y, 2011-NMCA-094, ¶ 26, 265 P.3d 720, 728 (2011)("[A]n agent's authority to bind a principal to arbitration does not have to be specifically or separately granted."). Cf. Williston on Contracts § 35:11 at 275 (4th Ed.) ("An agent has the power to make contracts that are binding on a principal . . . when the agent has actual authority."). Hatton also states her authority argument in terms of voidability, further indicating that her argument pertains to contract validity and not to manifestation of intent. See Tr. at 20:22-24 (Bossie)("You do not even get [to] the delegation clause that's contained within, if this is a void null contract.").

Additionally, as in Rent-A-Center, Hatton's unconscionability arguments attack validity and not manifestation of intent. See, 561 U.S. at 69 n.1 ("The validity of a written agreement to arbitrate [means] whether it is legally binding, as opposed to whether it was in fact agreed to -- including of course, whether it was void for unconscionability[]).").

standard.[4]

In making this argument, Hatton relies on several out-of-state cases to urge this Court to adopt a rule that even where a limited guardian has authority to act on her ward's behalf, the guardian should inquire into the ward's preferences when constitutional rights are at stake. See Response 11-13. The Court concludes the state cases cited are inapposite and declines to adopt a new legal rule, especially in the context of an arbitration agreement. In Quesnell v. State, 517 P.2d 568, 570 (Wash. 1973)(en banc), the Supreme Court of Washington determined that a guardian could not waive an individual's right to a jury trial who had been subject to a mental illness civil commitment proceeding. See 517 P.2d at 570. The material difference between this Washington case and Hatton's is that the guardian in Quesnell v. State, effectively waived the jury trial right before the accused had been found mentally incompetent. See Quesnell v. State,

_____

[4]Hatton's "proper protocol" argument primarily contends that SM Gantz should have "inquir[ed]" into Moreno's preferences vis-à-vis waiver of her jury trial right or, at least, should have acted in Moreno's "best interest[]." Response at 10. If an inquiry into Moreno's preferences is required, it could suggest that Moreno had to, in some way, agree to the Arbitration Agreement. On the other hand, inquiring into Moreno's preference could also be an exercise in obtaining more authority. If, as a matter of law, inquiring into preferences is a matter of agreement, it would require a clear-and-unmistakable analysis, but if it only implicates authority and, thus, the contract's validity, it would not require that inquiry. See supra, n.3. The Court concludes that Hatton's protocol argument implicates only authority. Agreement or, "manifestation of intent," is typically an offer and acceptance of terms, although sometimes action can achieve agreement. See Restatement (Second) of Contracts § 22. Tenth Circuit caselaw similarly suggests the clear-and-unmistakable threshold is almost exclusively an exercise in evaluating the Arbitration Agreement's terms and not a party's actions. See, e.g., Belnap v. Iasis Healthcare, 844 F.3d at 1281, 1284. The Court, however, proceeds with the clear-and-unmistakable analysis, because language from Comm'n Workers of America v. Avaya, Inc., suggests that the analysis is appropriate where "there was a fact issue regarding the parties' consent to submit to arbitration." 693 F.3d at 1303. Hatton essentially argues that SM Gantz needed Moreno's additional consent. See Response at 10-13. Additionally, Hatton cites at least once case for her proper protocol argument that concludes a party must consent before waiving her jury trial right. See Quesnell v. State, 517 P.2d 568, 570 (Wash. 1973)(en banc). Given that Hatton's argument could pertain to consent, and the Tenth Circuit could have signaled that consent is an appropriate inquiry for a clear-and-unmistakable analysis, the Court will analyze Hatton's proper protocol argument under the clear-and-unmistakable test.

517 P.2d at 570-71. Accordingly, the Supreme Court of Washington concluded that the jury trial right "cannot be waived by a guardian ad litem without the knowing consent of the person charged with being mentally ill," because waiver without consent jeopardized the patient's Due Process rights. 517 P.2d at 575, 579. In contrast here, Moreno had already been found incapacitated at the time SM Gantz signed the Admission Agreement, Moreno never challenged that finding, and Hatton has not raised a Due Process issue. Another case Hatton relies upon, Edward W. v. Lamkins, 122 Cal. Rptr. 2d 1 (Cal. Ct. App. 2002), concluded that a temporary conservator could not waive the statutorily required notice to the proposed conservatee without violating Due Process. See 122 Cal. Rptr. 2d at 24. The Court concludes that Edward W. v. Lamkins, is unpersuasive, because Due Process is not at issue in this case, and the conservatee's right to notice in Edward W. v. Lamkins, arose from a specific California statute. See 122 Cal. Rptr. 2d at 16. Accordingly, even if the Court concludes that Edward W. v. Lamkins is persuasive, the relevant inquiry is to determine whether the New Mexico Temporary Guardian Statute requires the temporary guardian to obtain consent or inquire into preferences prior to waiving any rights. The statute, however, does not impose such a requirement. See N.M. Stat. Ann. § 45-5-312(A). N.M. Stat. Ann. § 45-5-312(B)(3) -- the statutory provision Hatton cites in support of her argument -- governs guardians, not temporary guardians, and its text undermines her argument. See Response at 12. It provides:

> In exercising health-care powers, a guardian may consent or withhold consent that may be necessary to enable the incapacitated person to receive or refuse medical or other professional care, counsel, treatment or service. That decision shall be made in accordance with the values of the incapacitated person, if known, or the best interests of the incapacitated person if the values are not known.

N.M. Stat. Ann. § 45-5-312(B)(3). The guardian can consent for her charge on her own volition, and the guardian must act in accordance with the incapacitated person's wishes, "if known," but

the guardian need not seek out what those values are if "not known." N.M. Stat. Ann. § 45-5-312(B)(3). Accordingly, SM Gantz need not obtain consent or inquire into preferences, and the Court will not adopt a new rule.[5] Because the Court declines to adopt this rule, it concludes that Hatton did not challenge the Arbitration Agreement's plain language, and there is clear-and-unmistakable evidence that the parties agreed to arbitrate arbitrability.

Even after meeting the clear-and-unmistakable requirement, however, a party may attack the arbitrability agreement's validity on contract defense grounds, such as fraud in the inducement or unconscionability. See 9 U.S.C. § 2 ("A written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid . . . save upon such grounds as exist at law or in equity for the revocation of any contract."); Rent-A-Center, 561 U.S. at 69 n.1 (noting that the clear-and-unmistakable analysis is a separate inquiry from a contract validity analysis); id. 561 U.S. at 68 ("Like other contracts, however, [arbitration agreements] may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'"(quoting Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996))). A federal court can, typically, consider those arguments. See Rent-A-Center, West, Inc. v. Jackson, 561 U.S. at 71 ("If a party challenges the validity under § 2 [of the FAA] of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement."). In this case, the Admission Agreement also delegates the power to decide the arbitration clause's validity to the arbitrator. See Admission

---

[5]The remaining cases Hatton cites are equally unpersuasive. See In re New York Presbyterian Hosp., Westchester Div., 693 N.Y.S. 2d 405, 412 (1999)(Concluding that, under New York law, a ward retains the right to a medical treatment plan hearing, absent express authorization to the contrary); Rodriguez v. Superior Court, 98 Cal. Rptr. 3d 728, 735 (Ct. App. 2009)(Concluding that waiver of jury trial right was not knowing or voluntary under California law when signer died during the statutorily prescribed 30 day right to revoke an arbitration period). Both cases turn on peculiarities in state law, which the Court concludes are not present here.

Agreement at 14 [at 22 on CM/ECF]("The Parties hereby expressly agree that the Arbitrator shall have exclusive authority to resolve any disputes related to the existence and/or enforceability of this Resolution of Legal Disputes provision.")  Accordingly, the Court must decide, here, whether it can consider Hatton's contract validity arguments in the face of this delegation clause, or, must it compel arbitration to let the arbitrator decide those issues.

Rent-A-Center, 561 U.S. at 65 provides the Court with the proper framework.   In Rent-A-Center, as here, a delegation clause was at issue, and it read in pertinent part: "The Arbitrator . . . shall have the exclusive authority to resolve any dispute relating to the . . . enforceability . . . of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable."  561 U.S. at 69.  The Supreme Court considered whether, under the FAA, and where the defendant, Rent-A-Center, had invoked this delegation clause, a federal court could rule on the arbitration clause's unconscionability.  See 561 U.S. at 65, 72.   Noting that under its longstanding precedent that "a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate," the Supreme Court concluded the correct approach was to consider whether the particular clause at issue, and not the contract as a whole, was valid, or, in that particular case, unconscionable.  561 U.S. at 70-72.  It further determined that considering the arbitration clause as a whole was inappropriate, too, because "Section 2 [of the FAA] operates on the specific 'written provision' to 'settle by arbitration a controversy' that the party seeks to enforce."   561 U.S. at 71-72.   Accordingly, because "Rent-A-Center [sought] to enforce . . . the delegation provision," the Supreme Court severed the delegation provision from "the remainder of the contract," in its remaining analysis.  561 U.S. at 71-72.

Flowing from that severance, the only remaining question before the Supreme Court was

"whether the delegation provision is valid under § 2 [of the FAA]." 561 U.S. at 70. With that narrow question before it, the Supreme Court, importantly, determined: "[U]nless [the plaintiff] challenged the delegation provision specifically, we must treat it as valid under § 2 [of the FAA] and must enforce it . . . leaving any challenge to the validity of the Agreement as a whole for the arbitrator." 561 U.S. at 72. After reviewing the plaintiff's briefing before the lower courts, the Supreme Court concluded that the plaintiff "challenged only the validity of the contract as a whole" and not the delegation clause. 561 U.S. at 72. In his response to the motion to compel arbitration, for example, the plaintiff referred to the "entire agreement" as providing "[Rent-A-Center] with undue advantages" and that "the *arbitration agreement as a whole* is substantively unconscionable." 561 U.S. at 73 (emphasis and alteration in original). Although the plaintiff's arguments that the contract's fee-splitting and discovery limitation clauses were unconscionable could have applied to the delegation clause, his failure to argue before the lower courts that his arguments as applied to the delegation clause were unconscionable was fatal. See 561 U.S. at 74. Accordingly, the Supreme Court concluded that it could not consider the merits of the plaintiff's unconscionability arguments. See 561 U.S. at 74.

With that controlling precedent in mind, the narrow question before the Court is whether Hatton specifically challenges the Delegation Clauses with her arguments. The Court concludes that Hatton does not so narrowly frame her challenges. Turning first to unconscionability, Hatton brings four challenges -- none on their face address the Delegation Clauses. First, Hatton argues that the "Arbitration Agreement" is unconscionable, because it unequally binds the residents' claims to arbitration, but not Good Samaritan's claims. Response at 14. On its face, the argument references "the Arbitration Agreement" as a whole, and the argument's substance targets the "All Other Disputes" clause and the "Late Payments Charges" section. See Response

at 14-15 (citing Admission Agreement at 6, 13 [at 14, 21 on CM/ECF]). When expanding on these arguments at the hearing, Hatton did not reference the delegation clause. See Tr. at 46:13-47:3 (Bossie). The Court, accordingly, cannot properly consider that unconscionability argument. See Rent-A-Center, 561 U.S. at 72. The remaining challenges attack the "Arbitration's cost provision," its "confidentiality requirement," and the provision stating that "[t]he arbitration shall be conducted in accordance with the rules of the arbitration service provider agreed upon by the parties." Response at 15-18; Admission Agreement at 13 [at 21 on CM/ECF]. Again, at the hearing, Hatton did not mention the delegation clause. See Tr. at 47:13-49:3 (Bossie). The Court also cannot properly consider those arguments. See Rent-A-Center, 561 U.S. at 72.

The next question is whether Hatton challenges the Delegation Clauses with her arguments about SM Gantz' authority to sign the Admission Agreement on Moreno's behalf. Once again, on the face of Hatton's Response, she references the Arbitration Agreement as a whole and not the Delegation Clauses: "The Arbitration Agreement is not enforceable because SM Gantz . . . had the authority to make only those decisions regarding Ms. Moreno's medical care and residential placement reasonably necessary to avoid her immediate and irreparable harm. This authority did not reasonably include waiving Ms. Moreno's right to a jury trial." Response at 2. See id. at 6 ("As previously stated . . . Defendant contends that the Arbitration Agreement is not enforceable because SM Gantz lacked the authority to waive Ms. Moreno's constitutional right to a jury trial."); id. at 8 ("[I]t appears that SM Gantz perfunctorily agreed to the Arbitration Agreement. . . . His signature on the Arbitration Agreement should, therefore, be of no effect."); id. at 9 ("SM Gantz had no authority to enter into the Arbitration Agreement."). At the hearing, Hatton did mention the delegation clause, but argued that: "The delegation clause

is contained within the arbitration agreement in this case. You do not even reach the delegation clause if this is a void unenforceable arbitration agreement." Tr. at 18:20-23 (Bossie). See id. at 20:22-24 (Bossie)("You do not even get [to] the delegation clause that's contained within, if this is a void null contract."); id. at 22:23-23:1; 23:12-24:1. These assertions again attack the Arbitration Agreement's validity, and do not challenge the Delegation Clauses.[6]

Although Hatton's attack on SM Gantz' authority to enter the whole Arbitration Agreement appears to bear on SM Gantz' authority to enter into the Delegation Clauses, that relationship is immaterial. In other words, the argument that, when a party lacks authority to sign an Arbitration Agreement, that party must also lack the authority to sign a portion of the Arbitration Agreement is incorrect as a matter of law under Rent-A-Center. It is conceivable, for example, that SM Gantz had authority to enter into portions of the Arbitration Agreement and not others. See Rent-A-Center, 561 U.S. at 73 (concluding the "unfairness of the fee-splitting arrangement may be more difficult to establish for the arbitration of enforceability than for arbitration of more complex and fact related aspects of the alleged employment discrimination."). Accordingly, without targeting the delegation provision specifically, the Court cannot properly consider Hatton's arguments that SM Gantz lacked authority to sign the Arbitration Agreement.[7]

---

[6]Hatton's assertions are also an incorrect statement of the law. See Belnap v. Iasis Healthcare, 844 F.3d at 1281 ("[T]he question of who should decide arbitrability precedes the question of whether a dispute is arbitrable.")(emphasis in original); Rent-A-Center, 561 U.S. at 71-72 (severing the delegation clause from the arbitration agreement, and resolving the delegation clause's effect before considering whether the arbitration agreement was unconscionable).

[7]The Court notes that Hatton occasionally phrased her challenge to the Arbitration Agreement in terms of waiving Moreno's right to a jury trial: "[D]id this corporate guardian . . . have the authority which needs to be strictly construed to waive the Seventh [A]mendment right to a jury trial." Tr. at 16:7-10 (Bossie). This reference to a jury trial could, conceivably, be

Hatton finally argues that "the arbitration agreement is also unenforceable because SM Gantz failed to observe proper protocols to waive Ms. Moreno's Constitutional right to a jury trial." Response at 10 (bold and underline omitted). This argument, on its face, does not challenge the arbitration provisions at all, but SM Gantz' other actions. Accordingly, this argument does not challenge the delegation provision, so the Court cannot properly consider this argument. See Rent-A-Center, 561 U.S. at 72. Because none of Hatton's arguments challenge the delegation provision, the Court leaves Hatton's challenges for the arbitrator, and, pursuant to the FAA, will compel arbitration. See Rent-A-Center, 561 U.S. at 72; 9 U.S.C. §§ 3-4.

## II. THE COURT WILL NOT ORDER DISCOVERY, BECAUSE THE FAA REQUIRES THE COURT TO STAY THIS ACTION.

Hatton requests "the right to conduct discovery regarding the Arbitration Agreement's enforceability" and that the Court hold an evidentiary hearing. Response at 2. Hatton later explains that she wants to "depose Mr. Gantz" to show that, in signing the Arbitration Agreement, "it would not and could not" have been done to "avoid immediate an[d] irreparable harm." Tr. 21:4-9 (Bossie). Discovery on that matter was relevant, according to Hatton, because SM Gantz' Letter of Temporary Guardianship authorized him to "make only those decisions . . . as reasonably necessary to avoid immediate harm." Letters of Temporary Guardianship at 29 on CM/ECF, filed January 9, 2017 (Doc. 14-1). See Tr. 21:4-9 (Bossie). Good Samaritan conceded that the FAA does allow a "limited hearing" when considering an "arbitration provision is at

_____

challenging the Delegation Clauses, because authority to enter into a contract can be an issue that a jury decides if there is genuine issue of material fact. See Bayless v. Christie, Manson & Woods Int'l., Inc., 2 F.3d 347, 350-51 (10th Cir. 1993). Once again, however, Rent-A-Center precludes the Court from considering whether this argument bears on the Delegation Clauses, because arguments that could apply cannot be considered, unless the parties argue that "*as applied* to the delegation provision" it rendered "*that provision*" void. Rent-A-Center, 561 U.S. at 74 (emphasis in original). As explained, Hatton did not argue that, as applied to the delegation provision, SM Gantz lacked authority to sign the Delegation Clauses.

issue." Tr. 36:10-14 (Bennett).

Based on the Court's determination that it must compel arbitration, it concludes that the Court must also stay this case and therefore cannot properly allow Hatton to depose SM Gantz. The FAA states: "[U]pon being satisfied that the issue involved in such suit or proceeding is referable to arbitration . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. Good Samaritan has applied for the Court to stay this action, <u>see</u> Motion to Compel at 20, and the Court will do so, because "9 U.S.C. § 3's mandatory language is binding," <u>La Frontera Center, Inc. v. United Behavioral Health, Inc.</u>, __F. Supp. __, 2017 WL 3172723, at *16 (D.N.M. 2017)(Browning, J.)(citing <u>Adair Bus Sales, Inc. v. Blue Bird Corp.</u>, 25 F.3d 953, 955). The Court will accordingly deny Hatton's request for discovery.

**III.      IF THE COURT COULD CONSIDER HATTON'S ARGUMENTS, THE COURT WOULD CONCLUDE THE ARBITRATION AGREEMENT BOUND HATTON.**

If the Court could consider Hatton's arguments, the Court would conclude the Arbitration Agreement bound Hatton. First, SM Gantz had authority to sign the Arbitration Agreement on Hatton's behalf, because SM Gantz' Temporary Guardianship Letter granted him the proper authority to enter the Admission Agreement and the Arbitration Agreement, and because recent Supreme Court precedent has concluded that guardians can waive patients' right to a jury trial in the arbitration context without specific authority.  Second, the Arbitration Agreement bound Hatton, because Moreno was the Admission Agreement's third-party beneficiary and Hatton is equitably estopped from challenging the Arbitration Agreement.

Additionally, the Arbitration Agreement is not procedurally or substantively unconscionable, because the Court concludes it was not unreasonably favorable to one party.

The provision allowing the parties to negotiate over potential procedural rules is not procedurally unconscionable, because it affords meaningful choice to both parties. Further, the Arbitration Agreement, on its face, applies equally to residents' and Good Samaritan's potential claims. Finally, Hatton has not provided enough information for the Court to conclude that the cost sharing provision is substantively unconscionable, and the Court will not expand New Mexico Law to conclude that a confidentiality clause can amount to substantive unconscionability.

### A. IF THE COURT WERE TO CONSIDER SM GANTZ' AUTHORITY, IT WOULD CONCLUDE THAT HIS AUTHORITY TO SIGN THE ADMISSION AGREEMENT BOUND HATTON.

Hatton argues that SM Gantz lacked authority to waive Moreno's constitutional right to a jury trial, so the Arbitration Agreement is unenforceable. <u>See</u> Response at 7. In short, she contends that New Mexico's guardian statute, <u>see</u> N.M. Stat. Ann. § 45-5-310(E), limits SM Gantz' authority to the authorization letter's terms, which, in this case, did not grant the necessary authority. <u>See</u> Response at 8. Rather, the Letters of Temporary Guardianship grants SM Gantz the power "to make only those decisions regarding . . . medical and psychiatric care, residential placement, safety, and supervision . . . as reasonably necessary to avoid immediate and irreparable harm." Letters of Temporary Guardianship at 29 on CM/ECF. She concludes that, because the Arbitration Agreement was optional, opting into the Arbitration Agreement was not reasonably necessary to avoid immediate and irreparable harm. <u>See</u> Response at 8; Tr. at 15-20 (Bossie). According to Hatton, SM Gantz could "plac[e] Ms. Moreno in a skilled nursing facility," but he could do so without waiving her jury trial right, and, thus, the letter did not authorize SM Gantz to sign the Arbitration Agreement. Response at 8.

This argument does not persuade the Court. The Court begins by noting that neither New Mexico courts nor Tenth Circuit courts have had opportunity to comment on NM Stat. Ann.

§ 45-5-310(E) or the powers of limited guardians under N.M. Stat. Ann. § 45-5-312(A). Although guardians are afforded broad powers under N.M. Stat. Ann. § 45-5-312(B), limited guardians do not have broad power. See N.M. Stat. Ann. § 45-5-312(A). "A person for whom a limited guardian has been appointed retains all legal and civil rights except those that have been specifically granted to the limited guardian by the court." N.M. Stat. Ann. § 45-5-312(A). As Hatton correctly notes, SM Gantz had the "authority to make only those decisions regarding [Moreno's] medical care and psychiatric care, residential placement, safety, and supervision . . . as reasonably necessary to avoid immediate and irreparable harm." Letters of Temporary Guardianship at 29 on CM/ECF.

Hatton concedes that SM Gantz had the authority to "plac[e] Ms. Moreno in a skilled nursing facility." Response at 8. That authority to place Moreno into Good Samaritan was all that was necessary for SM Gantz to sign the Arbitration Agreement. The Admission Agreement incorporated the Arbitration Agreement as a whole both by reference and by context -- the arbitration agreement is listed in the Admission Agreement's table of contents, the Arbitration Agreement's section contains a header entitled "Admission Agreement," the Arbitration Agreement's page numbers are 13 of 15 and 14 of 15, and the "Signatures page" come after the Arbitration Agreement. See Admission Agreement at 2, 13-15 ("The Admission Agreement and Resident Handbook, incorporated herein by this reference constitute the entire Contract by the Parties."). See also Barron v. Evangelical Lutheran Good Samaritan Soc'y, 2011-NMCA-094, ¶ 20, 265 P.3d 720, 726 ("[The Arbitration Agreement's] placement in the Admission Agreement and its clear language indicate that, . . . [Good Samaritan] required an agreement as to how a resident and [Good Samaritan] will resolve future legal disputes."). Because the Admission Agreement incorporated the Arbitration Agreement, to complete Moreno's admission to Good

Samaritan, SM Gantz necessarily had to make a decision regarding arbitration. SM Gantz could opt into arbitration, opt out, or leave the form blank, which would effectively be opting out. See Tr. at 64:17-20 ("[Q.] [If] they didn't check [the box in the Arbitration Agreement section] . . . then [Moreno] would have all [her] rights to file a lawsuit, right. [A.] That's right.")(Bennett, Court). No matter what action SM Gantz took to have Moreno admitted to Good Samaritan, he had to make a decision. In other words, although "signing . . . the Arbitration Agreement was not a condition of admission," Response at 8, deciding whether to opt in or out was a condition of admission. SM Gantz, accordingly, had the authority to decide to opt into the Arbitration Agreement. See Barron v. The Evangelical Lutheran Good Samaritan Soc'y, 2011-NMCA-094, ¶ 22, 24 265 P.3d 720, 726-27.[8]

Hatton contends, however, that SM Gantz had a fourth option, to "inquir[e] into"

_____

[8]The parties argue over the applicability of Barron v. The Evangelical Lutheran Good Samaritan Soc'y, 2011-NMCA-094, 265 P.3d 720 ("Barron"), to the case's facts. See Motion to Compel at 12; Response at 8-10. The Court notes that the issue is similar: whether a Good Samaritan patient gave authority to her granddaughter to bind her to arbitration, when the patient authorized her granddaughter to "complete her admission paperwork." Barron, 2011-NMCA-094, ¶ 1, 265 P.3d at 720, 722. Based on the patient authorizing the granddaughter to sign the admission agreement, the Court of Appeals of New Mexico concluded that the agent granddaughter's "authority encompassed the arbitration clause," in part, because the arbitration clause was part of the admission agreement. Barron, 2011-NMCA-094, ¶¶ 20, 40, 265 P.3d 720, 731.

There are some differences between this case and Barron. In Barron, a nursing home resident challenged the amount of authority she gave her granddaughter, similar to Hatton's challenge to SM Gantz' authority, but, unlike Barron, the limited guardian statute is relevant to Hatton, which proscribes the guardian's power to that which a court granted. See Barron, 2011-NMCA-094, ¶ 19, 265 P.3d at 726; NM. Stat. Ann. § 45-5-312(A). In some respects, the granddaughter's authority in Barron differs from the authority the state court granted to SM Gantz, because the granddaughter's authority arose from oral representations by a "mentally competent, alert, and oriented" patient. Barron, 2011-NMCA-094, ¶ 3, 265 P.3d at 722. The Court, nevertheless, concludes that Barron's reasoning is persuasive, because both cases turn on the agent's authorization to sign the Admission Agreement. See Barron, 2011-NMCA-094, ¶¶ 22, 24 265 P.3d 720, 726-27 ("The parties agreed that [the patient] authorize[d] [the agent] to 'complete her paperwork' for admission. . . . [W]e are not persuaded that [the patient's] broad grant of authority to [the agent] to complete the admission paperwork should be viewed as narrowly as Plaintiff asserts" to preclude the arbitration clause).

Moreno's preferences before waiving her jury trial rights or act "clearly" within Moreno's "best interests." Response at 10. In addition to the reasons explained, supra pp. 57-59, the Court concludes that imposing a requirement to inquire into Moreno's preferences violates the FAA, because it would "single[] out [an] arbitration agreement[] for disfavored treatment." Kindred Nursing Centers Ltd. P'ship v. Clark, 137 S. Ct. 1421, 1425 (2017). In a recent analogous situation, the Supreme Court considered whether individuals with powers of attorney over nursing home patients were required to obtain "specific authority to 'waive his principal's fundamental constitutional rights to access the courts [and] to trial by jury'" before signing an arbitration agreement. Kindred Nursing Center Ltd. P'ship v. Clark, 137 S. Ct. at 1425 (quoting Extendicare Homes, Inc. v. Whisman, 478 S.W.3d 306, 327 (Ky. 2015)). Noting that arbitration agreements could be invalidated on generally applicable contract defenses, but not on legal rules that "apply only to arbitration," the Supreme Court determined that a specific rule requiring special authority to waive the jury trial right "hing[ed] on the primary characteristic of an arbitration agreement." 137 S. Ct. at 1427. "Such a rule is too tailor-made to arbitration agreements," and "thus flouted the FAA's command to place those agreements on an equal footing with all other contracts." 137 S. Ct. at 1427, 1429. The Supreme Court, accordingly, reversed the Supreme Court of Kentucky's ruling that a power of attorney receive specific authority before waiving a patient's trial right. See 137 S. Ct. at 1429.

Although the Supreme Court's ruling in Kindred Nursing Center Ltd. P'ship v. Clark, 137 S. Ct. at 1429, considered powers of attorney and not, as here, a limited guardian's power, such a distinction is immaterial, because the Supreme Court's decision did not pivot on the level of power the agent had. See 137 S. Ct. at 1429. Rather, its decision hinged on the parties' request for a court rule that an agent cannot waive a jury trial right in the arbitration context

absent specific authority to do so. See 137 S. Ct. at 1427, 29. Hatton asks for a similar ruling. Response at 13 ("SM Gantz' failure to assess Ms. Moreno's condition to determine whether she could validly waive her right to a jury trial or her preferences in that regard, invalidates his February 27, 2014 signature on the Arbitration Agreement."). Although an inquiry into Moreno's preferences or what was in her "best interests" regarding her jury trial right might be a less onerous obstacle than obtaining authority to waive that jury trial right, it no less requires the Court to create a legal rule that "appl[ies] only to arbitration." Kindred Nursing Center Ltd. P'ship v. Clark, 137 S. Ct. at 1427.[9]

### B. IF THE COURT WERE TO CONSIDER WHETHER THE ARBITRATION AGREEMENT BOUND HATTON, BECAUSE MORENO WAS THE ADMISSION AGREEMENT'S THIRD-PARTY BENFICIARY OR BECAUSE OF EQUITABLE ESTOPPEL, IT WOULD CONCLUDE HATTON IS BOUND.

The parties dispute whether the Arbitration Agreement binds Moreno as a third-party beneficiary, and whether Hatton is equitably estopped from denying the Arbitration Agreement's validity. See Motion to Compel at 14-15, 18-19; Response at 9-10 n.1. Regarding Moreno's third-party beneficiary status, Good Samaritan argues that Moreno was the Admission Agreement's intended beneficiary, because she reaped the "services" under the Admission

---

[9]Even if the Court were to adopt a rule that SM Gantz had to act in Moreno's "best interest" vis-à-vis the jury trial right, Hatton does not argue why opting into arbitration was not in Moreno's best interest at the time Good Samaritan admitted her. Arbitration, for example, may be faster than typical courtroom litigation and may also provide more confidentiality. See Keith B. Nelson, Principal Deputy Assistant Attorney General, to Senator Patrick J. Leahy, Chairman of the U.S. Senate Comm. on the Judiciary (July 30, 2008), http://www.citizen.org/documents/DOJ%20-%2007-30-08%20Ltr.pdf ("Arbitration is typically a less expensive and quicker method of resolving disputes."); AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 344-45 (2011)(Arbitration "allow[s] for efficient streamlined procedures tailored to the type of dispute. It can be specified, for example, . . . [to] be kept confidential."). See also La Frontera Center, Inc. v. United Behavioral Health, Inc., __F. Supp. 3d__, 2017 WL 3172723, at *17 (D.N.M. 2017)(Browning, J.)(Arbitration "promotes judicial efficiency and conservation of resources by all parties."). In certain circumstances, both speed and confidentiality could have been beneficial to Moreno given her health status.

Agreement, so must be bound. Motion to Compel at 14. According to Good Samaritan, Hatton is equally bound as Moreno's Wrongful Death Estate. See Motion to Compel at 15-18. Hatton counters that Moreno cannot be a third-party beneficiary, because Moreno was a party to the contract. See Response at 10.

The Court agrees with Good Samaritan. Although the typical application of the third-party beneficiary doctrine applies when a contract's non-signatory attempts to enforce the contract against a signatory, many courts have used the "third-party beneficiary doctrine to compel a non-signatory to arbitrate." THI of New Mexico at Hobbs Center, LLC v. Patton, 2012 WL 1126 at *8 (D.N.M. Jan. 3, 2012)(Hansen, J.)(collecting cases). See THI of New Mexico at Vida Encantada, LLC v. Lovato, 848 F. Supp. 2d 1309, 1327 (D.N.M. 2012)(Vazquez J.). Whether a third-party beneficiary relationships exists "depends on if the parties to the contract intended to benefit the third party," and "[s]uch intent must appear . . . from the contract itself." Fleet Mortg. Corp. v. Schuster, 1991-NMSC-046, ¶ 4, 811 P.2d 81, 83. Here, Moreno did not sign the Admission Agreement. See Admission Agreement at 15 [at 23 on CM/ECF]. Moreno was, accordingly, a non-signatory and, thus, not a party as Hatton contends. See THI of New Mexico at Vida Encantada, LLC v. Lovato, 848 F. Supp. 2d 1309, 1327 (D.N.M. 2012)(Vazquez J.)(Concluding that a nursing home resident who did not sign the nursing home's admission agreement was a not a party, but a third-party beneficiary). The Court also concludes that Moreno was a third-party beneficiary, because the Admission Agreement's terms demonstrate that the signatories intended for Moreno to receive benefits from the Admission Agreement. Moreno is the named resident, the contract's clear purpose is for her care, and, under its terms, she was to receive, among other things, "room, board, required nursing care, dietary services, [and] an activities program." Admission Agreement at 2 [at 10 on CM/ECF]. See THI of New

Mexico at Vida Encantada, LLC v. Lovato, 848 F. Supp. 2d at 1327 (Concluding that a nursing home resident was a third-party beneficiary, because "she was the named resident . . . the terms of the Admission Agreement refer to benefits . . . [and her] care was the essential purpose of the agreement[]."); THI of New Mexico at Hobbs Center, LLC v. Patton, 2012 WL 1126 at *9. Because she reaped these benefits, Moreno is bound. See THI of New Mexico at Vida Encantada, LLC v. Lovato, 848 F. Supp. 2d at 1327. The Court also concludes that Hatton is bound, because the Admission Agreement binds the resident's "heirs, personal representatives, executors, administrators, and assigns." Admission Agreement at 1 [at 9 on CM/ECF]. See THI of New Mexico at Vida Encantada, LLC v. Lovato, 848 F. Supp. 2d at 1328 (Concluding that a nursing home resident's estate was bound to arbitration, because contract language bound the resident's "successors, assigns, heirs, personal representatives, [or] guardians.").

Regarding equitable estoppel, Good Samaritan argues that Hatton is estopped from denying the Arbitration Agreement's validity, because Moreno accepted the benefits of the Admission Agreement. See Motion to Compel at 18. Hatton replies that equitable estoppel is inapplicable, because she is challenging the Arbitration Agreement -- not the Admission Agreement -- and Moreno never obtained any benefits from the Arbitration Agreement. See Response at 10 n.1. An estoppel claim exists when "(1) the party to be estopped made a misleading representation by conduct; (2) the party claiming estoppel had an honest and reasonable belief based on the conduct that the party to be estopped would not assert a certain right under the contract; and (3) the party claiming estoppel acted in reliance on the conduct to its detriment or prejudice." Brown v. Taylor, 1995-NMSC-050, ¶ 10, 901 P.2d 720, 723-24. The Court concludes that Hatton is estopped from denying the Arbitration Agreement's validity. At least three courts have signaled that the estoppel test is highly similar to a third-party

beneficiary analysis in the arbitration context.  See Damon v. StrucSure Home Warranty, LLC, 2014-NMCA-116, ¶ 16, 19 338 P.3d 123, 127-28 ("We conclude that the doctrine of equitable estoppel is appropriate in this case. Plaintiffs seek to receive a direct benefit from the agreement."); THI of New Mexico at Hobbs Center, LLC v. Patton, 2012 WL 1126 at *10; Murken v. Suncor Energy, Inc., 2005-NMCA-102, ¶ 13, 117 P.3d 985, 989.  The Court notes, however, that the estoppel factors appear to place a higher burden on the party asserting the doctrine than the third-party beneficiary doctrine -- the asserting party must demonstrate misleading conduct and reasonable reliance.  Nevertheless, the Court concludes that Moreno's eighteen month residency at Good Samaritan without challenging the Arbitration Agreement herself -- or SM Gantz challenging it -- was misleading conduct if Moreno did not intend to be bound by the agreement.  Good Samaritan also had an honest and reasonable belief that the terms bound Moreno and her successors, and Good Samaritan relied to its detriment by providing services to Moreno.  See THI of New Mexico at Hobbs Center, LLC v. Patton, 2012 WL 1126 at *10 (Estopping a nursing home resident's estate from denying applicability of arbitration agreement).  Hatton's argument that Moreno reaped no benefit from the Arbitration Agreement, so is not bound to that agreement, is unavailing, because the Arbitration Agreement was part of the Admission Agreement, and she did, as a matter of law, receive some benefit from it, because there are advantages to arbitration.  See THI of New Mexico at Vida Encantada, LLC v. Lovato 848 F. Supp. 2d at 1327; supra, n.9.  Accordingly, the Court concludes that even if SM Gantz lacked authority to sign the Admission Agreement, Hatton is bound as a successor to a third-party beneficiary, and is estopped from denying the Arbitration Agreement's applicability.

### C.  IF THE COURT WERE TO CONSIDER WHETHER THE ADMISSION AGREEMENT IS PROCEDURALLY OR SUBSTANTIVELY UNCONSCIONABLE, IT WOULD CONCLUDE THE ADMISSION AGREEMENT WAS NOT PROCEDURALLY OR SUBSTANTIVELY UNCONSCIONABLE.

The Admission Agreement is enforceable, because Hatton has not met her burden to demonstrate that the Admission Agreement is unconscionable.  See Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 7, 385 P.3d at 621.  Even taking all arguments together, as Hatton urges the Court, see Tr. at 48:24-49:2 (Bossie), any flaws that exist do not rise to the level of "precluding a meaningful choice of the other party," Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 7, 385 P.3d at 621 (quoting Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 21, 208 P.3d 901, 907).

Hatton's procedural unconscionability argument attacks a clause that affords the parties an opportunity to bargain over the arbitration's procedural rules.  See Response at 17-18.  The Court declines to conclude that clause is unconscionable, because it affords the parties meaningful choice.  Hatton's substantive unconscionability arguments attack the Arbitration Agreement's scope, its cost-sharing provision, and its confidentiality clause.  See Response at 14-17.  The Court concludes that, on balance, those clauses are equitable and there is insufficient evidence to conclude that the cost-sharing provision is unconscionable.

### 1.  If the Court were to Consider Whether the Arbitration Agreement was Procedurally Unconscionable, the Court Would Conclude that the Arbitration Agreement is not Procedurally Unconscionable.

The Arbitration Agreement is not unenforceable as procedurally unconscionable. In considering whether a court should enforce a contract or a contract provision, the New Mexico Supreme Court has suggested that the analysis of unconscionability should be placed in context, noting that "[t]he business condition under which [a] contract was formed directly affects the

parties' relative bargaining power, reasonable expectations, and the commercial reasonableness of risk allocation as provided in the written agreement." Ramirez-Eames v. Hover, 1989-NMSC-038, ¶ 9, 775 P.2d 722, 725. Regardless of the context, however, contracts are presumed enforceable, and "[a]bsent unusual circumstances such as . . . unconscionability, a valid contract will be enforced, notwithstanding allegations that one party has received the better part of the bargain." Ramirez-Eames v. Hover, 1989-NMSC-038, ¶ 4, 775 P.2d at 724. See Drink, Inc. v. Martinez, 1976-NMSC-053, ¶ 11, 556 P.2d 348, 351 ("The doctrine of unconscionability was intended to prevent oppression and unfair surprise, not to relieve a party of a bad bargain."). A contract is procedurally unconscionable "only where the inequality is so gross that one party's choice is effectively non-existent." Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 18, 709 P.2d at 679. "When assessing procedural unconscionability, courts should consider whether the contract is one of adhesion." Rivera v. Am. Gen. Fin. Servs., 2011-NMSC-033, ¶ 44, 259 P.3d 803, 817. Whether a party has meaningful choice is "determined by examining the circumstances surrounding the contract formation, including the particular party's ability to understand the terms of the contract and the relative bargaining power of the parties." Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d at 679 (internal citations omitted). Consequently, "[a]nalyzing procedural unconscionability requires the court to look beyond the four corners of the contract and examine factors 'including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other.'" State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d at 669 (quoting Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 23, 208 P.3d at 907-08).

Hatton argues that the Admission Agreement is procedurally unconscionable, because the

provision covering the arbitration's procedural rules was too vague for Moreno to have made an

informed decision about accepting or rejecting the Arbitration Agreement.  See Response at 17-

18.  That provision states:

> The arbitration shall be conducted in accordance with the rules of the arbitration
> service provider agreed upon by the Parties.  In the event rules of an arbitration
> service provider are not available for use or the Parties have not agreed to a
> different set of procedures to govern the arbitration, the Parties agree to use the
> neutral code of procedure available from The Evangelical Lutheran Good
> Samaritan Society.

Admission Agreement at 13 [at 21 on CM/ECF].

The Court disagrees with Hatton's contention that this provision creates an unequal

position "so gross that one party's choice is effectively non-existent."  Guthmann v. La Vida

Llena, 1985-NMSC-106, ¶ 18, 709 P.2d at 679.  On its face, the provision allows the parties to

come to an agreement about the service provider's rules, thus suggesting that Hatton will not be

deprived of meaningful choice.  Although it is conceivable that Good Samaritan could

intentionally reject every proposed servicer provider or set of rules so that the arbitration would

default to Good Samaritan's procedural code, that assumes Good Samaritan will act in bad faith

and there has been no evidence of that conduct.  Concluding in Hatton's favor on this issue

would turn the unconscionability rules upside down.  If the Court concluded that arbitration

agreements were unconscionable when they failed to identify what rules would govern, in order

to afford a party some negotiating power over those rules, it would incentivize Arbitration

Agreement drafters to mandate their own rules, eliminating meaningful choice.[10]

---

[10]The three out-of-state court cases that Hatton cites do not weigh against this conclusion.
In each, the drafting party mandated the procedural rules that governed the arbitration, and, the
drafting party did not provide a copy of those rules.  See Carmona v. Lincoln Millennium Car
Wash Inc., 171 Cal. Rptr. 3d 42, 50 (Ct. App. 2014))(Flier, J.)(Companies' failure to provide the
"employment dispute rules of the [American Arbitration Association]" was a "factor that
support[ed] procedural unconscionability" where the arbitration agreement referenced the

Further, the Court observes that the Arbitration Agreement is not a contract of adhesion -- SM Gantz could have opted out. Finally, the Court determines that SM Gantz was a relatively sophisticated party in this transaction, because it is a corporate entity that "frequently serve[s] as a court-appointed legal guardian," has been "certified by the Center for Guardianship Certification," "ha[s] reviewed and entered into admission agreements for many nursing home placements, and [is] familiar with the option of arbitration of any disputes that may arise." Affidavit of Bryan Gantz ¶¶ 1 6, at 1-2 (dated November 28, 2016), filed on December 13, 2016, (Doc. 1-1). On these facts, the Court determines there is no procedural unconscionability.

### 2. If the Court Were to Consider Whether the Admission Agreement is Substantively Unconscionable, it Would Conclude that the Arbitration Agreement is not Substantively Unconscionable.

The Arbitration Agreement is also not substantively unconscionable. Substantive unconscionability requires courts "to consider 'whether the contract terms are commercially reasonable and fair, the purpose and effect of the terms, the one-sidedness of the terms, and other similar public policy concerns" to determine "the legality and fairness of the contract terms themselves.'" Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 8, 385 P.3d at 621 (quoting Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 22, 208 P.3d at 907). Accordingly, when examining a contract for substantive unconscionability, courts must "examine the terms on the face of the contract and . . . consider the practical consequences of those terms." Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 8, 385 P.3d at 621-

---

American Arbitration Association's rules); Lucas v. Gund, 450 F. Supp. 2d 1125, 1131 (C.D. Cal. 2006)(Rafeedie, J.)(Failure to provide the procedural rules referenced in an arbitration agreement, "would only render the agreement unenforceable if those rules were substantively unconscionable."); Carlson v. Home Team Pest Defense, Inc., 191 Cal. Rptr. 3d 29, 39 (An arbitration agreement "referenced the Dispute Resolution policy, but it was not available to [the employee].") Those facts contrast with Moreno's Admission Agreement, because the drafters gave her power to affect the rules. The Arbitration Agreement here empowers her and should not keep her in the dark.

22 ("[S]ubstantive unconscionability can be found by examining the contract terms on their face.")

Under New Mexico contract law, an arbitration agreement is substantively unconscionable if it contains a unilateral carve-out that explicitly exempts from mandatory arbitration those judicial remedies that the drafting party with superior bargaining power is likely to need, while providing no such exemption for the non-drafting party with inferior bargaining power. See Rivera v. American General Financial Services, Inc., 2011-NMSC-033, ¶¶ 53-54, 259 P.3d at 818-19; Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 32, 208 P.3d at 907-10. By contrast, an arbitration agreement that contains a bilateral carve-out that explicitly excludes from mandatory arbitration a certain set of claims is not substantively unconscionable, even if the party with superior bargaining power is more likely to assert the excluded claims in a judicial forum. See Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 21, 385 P.3d at 624 (holding that an arbitration agreement between a lender and a borrower that included a bilateral exception for claims less than $10,000 was not substantively unconscionable, "even if one party is substantively more likely to bring small claims actions . . . .").

Hatton marshals three arguments for substantive unconscionability. First, she argues that the Arbitration Agreement binds residents' "most likely claims" and reserves Good Samaritan's "most likely claim for collection of past-due accounts" for court resolution. See Response at 14. The relevant provision states:

> Any legal controversy, dispute or claim of any kind arising out of or related to this Admission agreement, or the breach thereof, or, related to the care of stay at the Facility, shall be settled exclusively by binding arbitration . . . This arbitration clause is meant to apply to all controversies, disputes, disagreements or claims including, but not limited to, all breach of contract claims, all negligence and malpractice claims, all tort claims and all allegations of fraud concerning entering into or canceling this Admission Agreement. This arbitration provision binds all parties whose claims may arise out of or relate to treatment or service provided by

the center including any spouse or heirs of the Resident.

Admission Agreement at 13 [at 21 on CM/ECF]. The Court concludes that this provision does not rise to the level of substantive unconscionability, because it broadly covers "any legal controversy, dispute or claim of any kind arising out of or related to this Admission agreement," which would capture claims equally by both parties. Hatton's argument that the Admission Agreement favors Good Samaritan, because it "only specifically references claims that would potentially be brought by residents," is unpersuasive. Response at 15. Although it does list several resident likely claims, such as "negligence and malpractice," the Admission Agreement states that these examples include "but [are] not limited to" the ones listed. Admission Agreement at 13 [at 21 on CM/ECF]. The cases cited by Hatton do not persuade the Court to conclude otherwise, because the arbitration agreements in those cases had specific language carving out the arbitration agreement drafters' most likely claims. See Ruppelt v. Laurel Healthcare Providers, LLC, 2013-NMCA-014, ¶ 3 293 P.3d 902, 905 (Holding unconscionable an agreement that stated "[t]his [a]rbitration [a]greement shall not apply to disputes pertaining to collections or discharge of residents."); Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC, 2013-NMCA-077, ¶ 2, 306 P.3d 480, 482 (Holding unconscionable an agreement that excluded "guardianship proceedings, collection and eviction actions initiated by the Health Care Center, [and] any dispute where the amount in controversy is less than Two Thousand Five Hundred Dollars."); Rivera v. American General Financial Servs., Inc., 2011-NMSC-033, ¶ 53, 259 P.3d 803, 818-19 (Holding unconscionable an agreement that "except[ed] foreclosure and repossession from arbitration."); Cordova v. World Finance Corp., 2009-NMSC-021, ¶ 4, 208 P.3d 901, 904 (Holding unconscionable an agreement where a loan servicer reserved, "in the event of a default" any "remedies in an action at law or in equity.") In contrast, the Admission

Agreement has no such carve out.  See Admission Agreement at 1-15 [at 9-23 on CM/ECF].

Hatton's contention that the reference to court costs under the "Late Payment Charges" section

demonstrates that the Admission Agreement carves out Good Samaritan's most likely claim.  See

Response at 15.  Because arbitration is optional at the time a party enters into the Admission

Agreement, the provision operates to reserve Good Samaritan's rights in case a party opts out of

arbitration, and a claim ends up in court.  It does not carve out Good Samaritan from the broad

provision stating that "[a]ny legal controversy, dispute or claim of any kind arising out of or

related to this Admission agreement," is arbitrable.  Admission Agreement at 13 [at 21 on

CM/ECF]

Second, Hatton argues that the provision splitting the arbitration costs between the two

parties is substantively unconscionable.  See Response at 16.  Hatton has represented that

"[g]enerally an arbitrator can run from 250 to 350 to 450 per hour . . . , [and that] Moreno's

[E]state . . . doesn't have any money to do that." Tr. 47:15-20 (Bossie).  The Court recognizes

that arbitration can be expensive.  It is, however, Hatton's burden to demonstrate not only a high

cost, but the likelihood of a prohibitive cost, and Hatton has not given the Court sufficient

evidence to determine that Hatton would be denied an opportunity to vindicate her rights.  See

Padilla v. State Farm Mut. Auto. Ins. Co., 2003-NMSC-011, ¶ 14, 68 P.3d 901, 907 ("[T]he mere

'risk that [a party] will be saddled with prohibitive costs is too speculative to justify the

invalidation of an arbitration agreement.'")(quoting Green Tree Fin Corp. -Ala. v. Randolph, 531

U.S. 79, 92 (2000)); Green Tree Fin. Corp. -Ala. v. Randolph, 531 U.S. at 91 ("It may well be

that the existence of large arbitration costs could preclude a litigant . . . [b]ut the record does not

not show that Randolph will bear such costs if she goes to arbitration. Indeed, it contains hardly

any information on the matter.").  The Court has no reliable estimate of the cost or duration of

the arbitration proceeding, how complex the issues would be, how many witnesses Hatton would call, nor of Moreno's Estate's resources. While sympathetic to Hatton's representation that her Estate "doesn't have any money to [arbitrate]," the Court lacks sufficient evidence to conclude that the Arbitration Agreement would be substantively unconscionable on that ground. Litigation is expensive, too, and it is unclear how much Hatton would be charged under the Arbitration Agreement. The parties agreed to "divide any filing fee and the costs of the arbitrator equally." Admission Agreement at 13, [at 21 on CM/ECF]. Good Samaritan, thus would cover half of the cost, and, because the Admission Agreement does not mandate a certain arbitrator, Hatton has some ability to negotiate for a reasonably priced arbitrator. Good Samaritan also represents that the Admission Agreement does not prohibit recovering attorneys' fees or costs, so the parties could agree "to allow for recovery [of] attorneys' fees and costs." Tr. at 55:10-15 (Bennett).

Finally, Hatton argues that the confidentiality agreement makes the Arbitration Agreement substantively unconscionable, because "it gives a litigation advantage to" Good Samaritan, while stripping residents "of such an advantage." Response at 17. At the hearing, Hatton expanded that the confidentiality agreement "benefits Good Sam[aritan]," especially in the punitive damages inquiry, because it shields Hatton from obtaining information of widespread harm to other "vulnerable adults." Tr. at 48:5-23 (Bossie). Hatton admitted, however, that the confidentiality clause by itself would not rise to the level of unconscionability. See Tr. at 48:5-7 (Bossie). The provision reads: "Any documents or evidence produced during an arbitration proceeding . . . shall be confidential." Admission Agreement at 13 [at 21 on CM/ECF]. The Court could find no New Mexico precedent concluding that a confidentiality clause could amount to substantive unconscionability. The Court, applying state law, is hesitant

to adopt a theory of unconscionability that the state has yet to ratify, especially given the parties concession that the confidentiality clause, by itself, would not amount to substantive unconscionability. The Court, accordingly, declines to conclude that this confidentiality agreement is substantively unconscionable.

Finally, the Court has considered Hatton's contention that, taken all together, her arguments prove unconscionability. None of her arguments have amounted to unconscionability individually. Taken all together, they also do not give rise to unconscionability. The Admission Agreement is, thus, not substantively unconscionable.

**IT IS ORDERED** that (i) Plaintiff Evangelical Lutheran Good Samaritan Society, a North Dakota Company D/B/A Good Samaritan Society-Betty Dare's Motion to Compel Arbitration and Petition for Appointment of Arbitrator, filed December 13, 2016 (Doc. 3), is granted; (ii) Defendant Beatrice Moreno, Deceased, By the Personal Representative of the Wrongful Death Estate, Monica Cruz Hatton must submit to arbitration the claims asserted against Plaintiff The Evangelical Lutheran Good Samaritan Society, a North Dakota Corporation D/B/A Good Samaritan Society-Betty Dare, in the First Amended Complaint for Wrongful Death, Negligence, Negligence Per Se, Misrepresentation, Violation of the Unfair Trade Practices Act, and Punitive Damages, filed December 13, 2016 (Doc. 1-2); and (iii) further proceedings in this case are stayed.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Martha G. Brown
Deana M. Bennett
Jeremy K. Harrison
Zoe E. Lees
Modrall, Sperling, Roehl, Harris & Sisk, PA
Albuquerque New Mexico

    *Attorneys for the Plaintiff*

Mary Ellen Spiece
Melanie Bossie
Wilkes & McHugh PA
Phoenix, Arizona

    *Attorneys for the Defendant*