**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

THE EVANGELICAL LUTHERAN GOOD SAMARITAN SOCIETY, a North Dakota Corporation d/b/a GOOD SAMARITAN SOCIETY-BETTY DARE,

Plaintiff,

vs.

No. CIV 16-1355 JB\KS

BEATRICE MORENO, deceased, by the personal representative of the wrongful death estate, MONICA CRUZ HATTON,

Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Defendant's Motion for Appointment of a Neutral Arbitrator, filed June 7, 2018 (Doc. 20)("Motion"). The Court held a hearing on January 7, 2019. See Clerk's Minutes at 1, filed January 7, 2019 (Doc. 25). The primary issue is who from among the following individuals the Court, pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-14 ("FAA"), should appoint as a neutral arbitrator in this matter: (i) the Honorable James Hall, former state District Judge for the First Judicial District of the State of New Mexico; (ii) Mr. William Madison of Madison, Mroz, Steinman & Dekleva, P.A.; (iii) Mr. Bruce Hall of Rodey, Dickason, Sloan, Akin, & Robb, P.A.; (iv) the Honorable Bruce Black, former United States of America District Judge for the District of New Mexico; (v) the Honorable William P. Lynch, former United States Magistrate Judge for the District of New Mexico; or (vi) the Honorable Alan Torgerson, former United States Magistrate Judge for the District of New Mexico.

The Court concludes that it will appoint an arbitrator in this matter and that it will appoint Judge Hall as the arbitrator.

## FACTUAL BACKGROUND

The Court recited the factual background and early procedural history in its Memorandum Opinion and Order, filed September 29, 2017, 277 F. Supp. 3d 1191 (Doc. 19)("MOO"). The Court incorporates that recitation here. The Court takes its facts from the Complaint to Compel Arbitration and Petition for Appointment of Arbitrator, filed December 13, 2016 (Doc. 1)("Complaint"). The Court provides these facts for background. It does not adopt them as the truth, and it recognizes that these facts are largely Plaintiff the Evangelical Lutheran Good Samaritan Society, d/b/a Good Samaritan Society -- Betty Dare's ("Good Samaritan") version of events.

> Good Samaritan owns and operates a nursing home in Alamogordo, New Mexico. See Complaint . . . ¶ 1[,] at 1 . . . . On February 27, 2014, Good Samaritan admitted [Defendant Beatrice ]Moreno into that nursing home, and she lived there until her death on August 26, 2015. See Complaint ¶¶ 8, 19, at 2, 5; [Plaintiff's Motion to Compel Arbitration and Petition for Appointment of Arbitrator at 1, filed December 13, 2016 (Doc. 3)("Motion to Compel")]. Also on February 27, 2014, the Twelfth Judicial District, County Court of Otero of the State of New Mexico, appointed SM Gantz OT Services, Inc. ("SM Gantz") Moreno's temporary guardian. See Complaint ¶ 6, at 2. As temporary guardian, SM Gantz received a Letter of Temporary Guardianship that authorized SM Gantz to make decisions regarding Moreno's "medical and psychiatric care, residential placement, safety, and supervision." See Complaint ¶ 7, at 2. When Moreno entered the nursing home, SM Gantz, acting as her legal temporary guardian, reviewed and signed the [Good Samaritan Society Admission Agreement (dated February 27, 2014), filed December 13, 2016 (Doc. 1-1)("Admission Agreement")] on Moreno's behalf. See Complaint ¶ 8, at 2-3; . . . Admission Agreement at 14-15 . . . . The Admission Agreement contains an Arbitration Agreement that gives the resident or his or her legal representative the option to agree to arbitrate disputes or to elect not to arbitrate disputes. See Admission Agreement [¶¶ A-E, ]at 13-14 . . . ; Complaint ¶¶ 10-11, at 3. If a resident or legal representative elects to arbitrate, the Admission Agreement explains that the resident is electing to waive his or her right to sue in a court of law and to a trial by jury. See Complaint ¶ 15, at 4; Admission Agreement

> [¶ C, ]at 13 . . . . SM Gantz elected to arbitrate disputes on Moreno's behalf. See Complaint ¶ 18, at 5; Admission Agreement at 14 . . . .

MOO at 2, 277 F. Supp. 3d at 1197.

The Admission Agreement contains two sentences relevant to choosing an arbitrator. See Admission Agreement ¶¶ C-D, at 13-14. First, the Admission Agreement provides: "The Parties shall work together in good faith to select a mutually agreeable individual arbitrator or a nationally recognized arbitration service provider." Admission Agreement ¶ C, at 13. Second, the Admission Agreement states: "The Parties agree that in the event they are unable to agree upon selection of a mutually agreeable individual arbitrator or nationally recognized arbitration service provider, Section 5 of the FAA shall control." Admission Agreement ¶ D, at 14.

> After Moreno died on August 26, 2015, Moreno's daughter, Monica Cruz Hatton, was appointed personal representative of Moreno's estate. [See Complaint ¶ 20, at 5-6.] Hatton subsequently filed a lawsuit in the Twelfth Judicial District Court [of New Mexico] against Good Samaritan. See Complaint ¶ 20, at 5-6. On November 21, 2016, Hatton filed an amended complaint in state court against Good Samaritan, among other defendants, alleging causes of action for wrongful death, negligence, negligence per se, negligent or intentional misrepresentation, violation of the Unfair Practices Act, and punitive damages. See Complaint ¶ 20-21, at 5-6; First Amended Complaint for Wrongful Death, Negligence, Negligence Per Se, Misrepresentation, Violation of the Unfair Trade Practices Act, and Punitive Damages at 1-22, filed December 13, 2016 (Doc. 1-2)("State Court Action").

MOO at 4, 277 F. Supp. 3d at 1198.

## **PROCEDURAL BACKGROUND**

> On December 13, 2016, Good Samaritan filed its Complaint requesting the Court to compel the parties to: (i) arbitrate pursuant to the Admission Agreement's terms; (ii) order Hatton to arbitrate all claims that she brought in the State Court Action against Good Samaritan; (iii) stay the State Court Action pending resolution of the arbitration process; (iv) stay further proceedings in this action pending the

> arbitration's conclusion or dismiss the matter without prejudice; and (v) order other proper relief. See Complaint, Prayer for Relief ¶¶ A-E, at 12.

MOO at 4-5, 277 F. Supp. 3d at 1197-98. In the MOO, the Court stayed the case and ordered that the parties pursue arbitration. See MOO at 74, 277 F. Supp. 3d at 1239. More than six months after the Court filed the MOO, Hatton filed the Motion, complaining that the parties could not agree to an arbitrator. See Motion at 3.

**1. The Motion.**

Hatton asks that, because over six months have passed since the Court ordered arbitration and the parties have yet to agree to an arbitrator, the Court appoint a neutral arbitrator. See Motion at 2. Hatton encourages the Court to choose Mr. Madison. See Motion at 2. Hatton explains that, under the arbitration agreement, when the parties cannot agree to a neutral arbitrator, the FAA's § 5 controls. See Motion at 1 (citing Arbitration Agreement at 13-14). According to Hatton, § 5 provides that the court shall "designate and appoint an arbitrator" "if for any reason there shall be a lapse in the naming of an arbitrator." Motion at 1 (quoting 9 U.S.C. § 5). Hatton explains that, in discussions with Good Samaritan, she proposed Mr. Madison; Mr. Hall; Mr. Paul Bardacke of Bardacke Allison; and Mr. Terry Yenson, of YLAW, P.C., as arbitrators, but, according to Hatton, Good Samaritan rejected her suggestions. See Motion at 1-2. Hatton states that she, similarly, has rejected Good Samaritan's proposals. See Motion at 2.

**2. The Response.**

Good Samaritan responded on June 21, 2018. See Response to Defendant's Motion for Appointment of a Neutral Arbitrator at 3, filed June 21, 2018 (Doc. 21)("Response"). Good Samaritan states that it is willing "to continue to engage with Defendant's counsel to agree to an arbitrator without this Court's intervention." Response at 1. Good Samaritan indicates that, should

the Court appoint Mr. Madison, Mr. Madison "would need to be disqualified." Response at 2. Good Samaritan explains that it desires a judge with "experience finding facts and reaching conclusions of law" to serve as arbitrator. Response at 2. Good Samaritan proposes Judge Hall; the Honorable Jay Harris, former state District Judge for the Fourth Judicial District of New Mexico; Christopher Kelly, former Arizona State Court Judge; Judge Black; Magistrate Judge Lynch; and Magistrate Judge Torgerson. See Response at 2.

**3. The Reply.**

Hatton replied on July 5, 2018. See Defendant's Reply in Support of Her Motion for Appointment of a Neutral Arbitrator, filed July 5, 2018 (Doc. 22)("Reply"). Hatton contends that, as over six months have passed since the Court issued the MOO and the parties have not yet chosen an arbitrator, the parties "have undoubtedly reached an impasse in" agreeing to an arbitrator. Reply at 1. Hatton repeats her request that the Court appoint Mr. Madison the arbitrator. See Reply at 2.

**4. The Hearing.**

According to Hatton, the negotiations over an arbitrator have "hit a standstill." Draft Transcript of Hearing at 3:22 (taken January 7, 2019)(Freeland)("Tr.").[1] Hatton stated that, in her Motion, she asks that the Court appoint Mr. Madison arbitrator. See Tr. at 3:8-9 (Freeland). Hatton notes that, although Good Samaritan opposes this appointment, Good Samaritan has given no reasons for its opposition. See Tr. at 3:9-11 (Freeland). Hatton continued that Good Samaritan has proposed Judge Hall, among others. See Tr. at 3:11-12 (Freeland). According to Hatton,

[1]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

however, when Hatton stated that it would accept Judge Hall, Good Samaritan rejected him. See Tr. at 3:14-18 (Freeland).

In response, the Court asked whether Hatton would accept individuals not on her list for proposed arbitrators. See Tr. at 4:4-14 (Court, Freeland). Hatton replied: "My understanding at this point [is that] those are the individuals that we put forth. Again James Hall was one that was picked from the list that was put forth from the defendant and their response that person would be acceptable as well. I mean, we would entertain others." Tr. at 4:15-21 (Freeland). The Court recapped: "So [Good Samaritan] proposed . . . Judge Hall, but now they're saying they don't want Judge Hall." Tr. at 4:25-5:2 (Court). Hatton confirmed that summary to be true. See Tr. at 5:3 (Freeland). She explained that she had suggested Judge Hall, because Good Samaritan had agreed to arbitrate a similar case with him, see Tr. at 5:3-7 (Freeland), and "he seemed like a safe bet," Tr. at 5:8 (Freeland).

The Court then looked to Good Samaritan, which explained its opposition to Judge Hall. See Tr. at 5:10-6:17 (Court, Harrison). According to Good Samaritan, it had no objections to Judge Hall's "qualifications or his capabilities." Tr. at 6:8 (Harrison). Good Samaritan worried about arbitrating with Judge Hall, because it had consented to arbitrate "another similar case," involving the same firms, with him. Tr. at 6:9 (Harrison). Good Samaritan expressed concern that allowing Judge Hall to arbitrate both cases would lead to confusion. See Tr. at 6:10-14 (Harrison). As an example, Good Samaritan cited that, in the arbitration process, Judge Hall and the parties might try to apply one deposition to both cases. See Tr. at 6:14-17 (Harrison).

According to Good Samaritan, it nevertheless desires that a former judge arbitrate the case, because Good Samaritan hopes for an arbitrator with experience deciding cases' merits, finding

facts, and reaching conclusions of law, rather than an individual with experience mediating, which emphasizes achieving solutions fair to both parties. See Tr. at 7:11-24 (Harrison). Good Samaritan opined that, in this matter, an arbitrator should decide the case "on the merits." Tr. at 7:18 (Harrison). When the Court turned back to Hatton on the question of appointing a former judge, see Tr. at 8:13-18 (Court), Hatton expressed her willingness to arbitrate with a former judge, see Tr. at 8:19 (Freeland). Hatton opposed, however, all judges that Good Samaritan had proposed except Judge Hall. See Tr. at 8:25-9:7 (Freeland).

The Court then recommended a series of other individuals to the parties. See Tr. at 9:8-10:11 (Court). Good Samaritan indicated that it had not considered all the people that the Court named, but that it had strong restrictions on whom it would consider. See Tr. at 10:16-21 (Harrison). Hatton clarified that she also had not researched some individuals named. See Tr. at 11:8-11 (Freeland). Hatton nevertheless continued, returning to Good Samaritan's opposition to Judge Hall. See Tr. at 13:1-22 (Freeland). Hatton stated that she still supported using Judge Hall, and argued that judges frequently see the same firms and similar issues, and that judges learned to "look at each case differently." Tr. at 13:11 (Freeland). See id. at 13:6-22 (Freeland).

Good Samaritan proposed that, if the Court would not use the names in the Motion or in the Response, the Court permit the parties to file three names, and choose from among those names. See Tr. at 11:12-15 (Harrison). Hatton agreed with Good Samaritan's proposal. See Tr. at 20-22 (Freeland); id. at 14:1-6 (Harrison). The Court, accordingly, accepted the suggestion and affirmed that the Court would not consider the matter until the following week. See Tr. at 14:10-11 (Court). According to the Court, if it did not hear from the parties within that time, it would pick an arbitrator, and, if it did hear from the parties, it would choose an arbitrator from the six

names -- three names from each party -- proposed. See Tr. at 14:11-17 (Court). Both parties agreed to the Court's inclination. See Tr. at 14:18-21 (Harrison, Freeland, Court).

**5. The Notices.**

Pursuant to the Court's request, on January 14, 2019, the parties submitted notices listing their three proposed neutral arbitrators. See Defendant's Proposed Neutral Arbitrators at 1-2, filed January 14, 2019 (Doc. 26)("Hatton List"); Plaintiffs [sic] List of Proposed Neutral Arbitrator's at 1-2, filed January 14, 2019 (Doc. 27)("Good Samaritan List"). Hatton proposes Judge Hall, Mr. Madison, and Mr. Hall. See Hatton List at 1-2. Hatton also summarizes the individuals' resumes. See Hatton List at 1-2. According to Hatton, "from 1995 to 2009," Judge Hall was a state District Judge and, "[a]fter retiring in 2010, Judge Hall opened a mediation and arbitration practice in Santa Fe." Hatton List at 1. Hatton notes that Mr. Madison "is both an attorney and a licensed pharmacist," with over forty-five years litigating largely as a defense attorney. Hatton List at 1. Last, Hatton explains that Mr. Hall is "the director of the Albuquerque office of Rodey, Dickason, Sloan, Akin, & Robb, P.A.," and has experience in litigation and arbitration. Hatton List at 2. Good Samaritan lists Judge Black, Magistrate Judge Lynch, and Magistrate Judge Torgensen. See Good Samaritan List at 1.

**LAW REGARDING THE FAA AND APPOINTING ARBITRATERS**

An arbitration agreement is a contract or a provision in a contract whereby parties agree to "settle by arbitration a controversy . . . arising out of such contract or transaction." 9 U.S.C. § 2. Federal law reflects a public policy favoring arbitration agreements. See Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1488-89 (10th Cir. 1994)("There is a strong federal policy encouraging the expeditious and inexpensive resolution of disputes through arbitration.").

"[T]he basic purpose of the Federal Arbitration Act is to overcome courts' refusals to enforce agreements to arbitrate." Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 270 (1995). "The FAA reflects the fundamental principle that arbitration is a matter of contract." Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 67 (2010). "The FAA thereby places arbitration agreements on an equal footing with other contracts, and requires courts to enforce them according to their terms." Rent-A-Center, West, Inc. v. Jackson, 561 U.S. at 67-68 (internal citations omitted).

The FAA governs motions to compel arbitration involving contracts related to commerce. See 9 U.S.C. §§ 1-16. Under § 4 of the FAA, a party "aggrieved" by another party's failure "to arbitrate under a written agreement for arbitration" may petition a federal court "for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. If one party's refusal to arbitrate under a written agreement aggrieves another party, the district court, upon petition, "shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. Section 2, the "primary substantive provision of the Act," Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983), provides: "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2. "If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4." Rent-A-Center, West, Inc. v. Jackson, 561 U.S. at 64.

Upon a finding that a matter is referable to arbitration, the FAA also indicates that the district court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. Notwithstanding 9 U.S.C. § 3's terms, however, several Courts of Appeals have concluded that "dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable." Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc., 252 F.3d 707, 709-10 (4th Cir. 2001). See Green v. Ameritech Corp., 200 F.3d 967, 973 (6th Cir. 2000)("The weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration." (internal quotation marks omitted)(quoting Alford v. Dean Witter Reynolds, Inc., 975 F.2d 1161, 1164 (5th Cir. 1992)); Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 156 n.21 (1st Cir. 1998)("[A] court may dismiss, rather than stay, a case when all of the issues before the court are arbitrable."); Sparling v. Hoffman Constr. Co., 864 F.2d 635, 638 (9th Cir. 1988)("[S]ection 3 gives a court authority, upon application by one of the parties, to grant a stay pending arbitration, but does not preclude summary judgment when all claims are barred by an arbitration clause.").

The United States Court of Appeals for the Tenth Circuit has cautioned that, when one of the parties petitions the court to stay an action pending compulsory arbitration, 9 U.S.C. § 3's mandatory language is binding, and it is error for the court to dismiss the action. See Adair Bus Sales, Inc. v. Blue Bird Corp., 25 F.3d 953, 955 (10th Cir. 1994). When, however, the party seeking to compel arbitration requests the court for dismissal, and there is no evidence in the record of any party requesting a stay, it is not error for the district court to dismiss the case. See Armijo v. Prudential Ins. of Am., 72 F.3d 793, 797 (10th Cir. 1995); Thompson v. THI of N.M. at Casa Arena Blanca, LLC, No. CIV 05-1331 JB/LCS, 2006 WL 4061187, at *16 (D.N.M. Sept. 12,

2006)(Browning, J.)(dismissing a case where the plaintiff neither requested a stay nor argued that some claims may not be arbitrable).

"Section 5 of the FAA provides a mechanism for appointment of an arbitrator." Brown v. ITT Consumer Fin. Corp., 211 F.3d 1217, 1222 (11th Cir. 2000). "If in the [arbitration] agreement provision be made for a method of naming or appointing an arbitrator," that method controls. 9 U.S.C. § 5. A court "shall designate and appoint an arbitrator": (i) when the arbitration agreement makes no provision for naming an arbitrator, a party "fail[s] to avail himself of" the method provided, or, "if for any other reason there shall be a lapse in the naming of an arbitrator . . . or in filling a vacancy"; and (ii) after "application of [a] party." 9 U.S.C. § 5. When designating or appointing an arbitrator, the court should appoint "a single arbitrator" unless the agreement otherwise provides. 9 U.S.C. § 5. Accordingly, "[w]here the parties' agreement does not address the appointment of an arbitrator or refers to arbitration rules that do not provide an appointment mechanism," or, a fault occurs in the appointment process, "the parties must resort to the statutes authorizing the courts to appoint an arbitrator." Qwest Corp. v. ZiaNet, Inc., No. MC 05-0005 MCA, 2005 WL 8163729, at *5 (D.N.M. June 2, 2005)(Armijo, J.)(internal quotation marks omitted)(quoting 21 Williston on Contracts § 57:68 (4th ed.)). Section 5, therefore, may require a court to act in a case otherwise stayed pending arbitration. See Lloyd v. HOVENSA, LLC., 369 F.3d 263, 270 (3d Cir. 2004)("[I]f the court enters a stay of the action and retains jurisdiction, then proceedings under §§ 5, 7, 9, 10, or 11 may be expedited, as the parties may simply return the [sic] to the same district judge presiding over the plaintiff's case."); B/E Aerospace, Inc. v. Jet Aviation St. Louis, Inc., No. 11 CIV. 4032 SAS, 2011 WL 2852857, at *1 (S.D.N.Y. July 1, 2011)(Jones, J.)(acting under § 5 of the FAA to review matters before the

issuance of a final arbitration award); Rayburn v. Bridgestone Firestone, No. CIV 05-0675 MCA/RHS, 2005 WL 8163476, at *5 (D.N.M. Dec. 29, 2005)(Armijo, J.)("[P]arties may seek the district Court's assistance during the course of arbitration, the district Court still has a significant role to play under the FAA even where it orders arbitration of all claims."). After a court appoints an arbitrator, the arbitrator acts with "the same force and effect as if he or they had been specifically named" in the agreement. 9 U.S.C. § 5.

**NEW MEXICO LAW REGARDING CONTRACT INTERPRETATION**

In contract cases, "the role of the court is to give effect to the intention of the contracting parties." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21, 925 P.2d 1184, 1190. "The primary objective in construing a contract is not to label it with specific definitions or to look at form above substance, but to ascertain and enforce the intent of the parties as shown by the contents of the instrument." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21, 925 P.2d at 1190 (citing Shaeffer v. Kelton, 1980-NMSC-117, ¶8, 619 P.2d 1226, 1229). "The parole evidence rule 'bars admission of evidence extrinsic to the contract to contradict and perhaps even supplement the writing.'" Mem'l Med. Ctr., Inc. v. Tatsch Constr., Inc., 2000-NMSC-030, ¶ 16, 12 P.3d 431, 437 (quoting C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 12, 817 P.2d 238, 242). If a contract is ambiguous, however, "evidence will be admitted to aid in interpreting the parties' expressions." C.R. Anthony Co. v. Loretto Mall Partners, 1991 NMSC-070, ¶ 12, 817 P.2d at 242. "On the other hand, if the court determines that the contract is clear and unambiguous on its face, evidence of the circumstances surrounding the transaction is inadmissible to vary or modify its terms." C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 12, 817 P.2d at 242 (emphasis in original)(citation omitted).

The question whether an agreement contains an ambiguity is a matter of law. See Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d 1232, 1235 (citing Levenson v. Mobley, 1987-NMSC-102, ¶ 7, 744 P.2d 174, 176). "An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (citation omitted). If, however, the "evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235. On the other hand, when the court concludes that the contract is "reasonably and fairly susceptible of different constructions, an ambiguity exists." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (citing Vickers v. N. Am. Land Dev., Inc., 1980-NMSC-021, ¶ 9, 607 P.2d 603, 606). New Mexico courts may consider extrinsic evidence to determine "whether the meaning of a term or expression contained in the agreement is actually unclear." Mark V. Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 ("New Mexico law, then, allows the court to consider extrinsic evidence to make a preliminary finding on the question of ambiguity."); C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 15, 817 P.2d at 242-43 ("We hold today that in determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance." (citation and footnote omitted)). Once the court concludes that an ambiguity exists, the resolution of that ambiguity becomes a question of fact. See Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 13, 845 P.2d at 1235. To decide an ambiguous term's meaning, "the fact finder may consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties'

intent." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 13, 845 P.2d at 1236. New Mexico contract law "requires the construction of ambiguities and uncertainties in a contract most strongly against the party who drafted the contract." Schultz & Lindsay Constr. Co., 1972-NMSC-013, ¶ 6, 494 P.2d 612, 614. See Rummel v. Lexington Ins., 1997-NMSC-041, ¶ 22, 945 P.2d 970, 977 ("An ambiguity in an insurance contract is usually construed against the insurer, because courts will weigh their interpretation against the party that drafted a contract's language.").

## ANALYSIS

The Court concludes that, pursuant to the FAA's § 5, the Court has authority to appoint an arbitrator in this matter. First, where the parties cannot agree to an arbitrator, the Admission Agreement provides no "method" for appointing an arbitrator other than the Court appointing one, and, because the parties have consumed more than six months in a standstill while negotiating over an arbitrator, the parties are "laps[ing] in the naming of an arbitrator." 9 U.S.C. § 5. Second, the parties have applied to the Court for assistance. See 9 U.S.C. § 5. The Court, therefore, will appoint Judge Hall to arbitrate this matter.

Under § 5, the Court has authority to appoint an arbitrator here. The Court must first determine whether this situation qualifies as one in which the arbitration agreement provides no method for appointing an arbitrator, a party has failed "to avail himself of" the method provided, or, "a lapse in the naming of an arbitrator . . . or in filling a vacancy" is occurring. 9 U.S.C. § 5. The Court concludes that this first § 5 requirement is met.

First, the situation falls into the first scenario that § 5 lists; the arbitration agreement does not provide a method for appointing an arbitrator. The Court begins with the Admission Agreement's terms. See Raja v. Ohio Sec. Ins., 305 F. Supp. 3d 1206, 1235 (D.N.M.

2018)(Browning, J.)(citing C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 12, 817 P.2d at 242 (prioritizing, in contract interpretation, a contract's terms)). The Admission Agreement provides that the parties will work together to choose a "mutually agreeable" arbitrator. Admission Agreement ¶ C, at 13. Where the parties cannot agree, the Admission Agreement directs the parties to § 5. See Admission Agreement ¶ D, at 14 ("The Parties agree that in the event they are unable to agree upon selection of a mutually agreeable individual arbitrator or nationally recognized arbitration service provider, Section 5 of the FAA shall control."). The Court, therefore, must decide whether the parties "are unable to agree" to an arbitrator, because, if the parties can agree, the Admission Agreement provides a method for appointing an arbitrator. Admission Agreement ¶ D, at 14. The Court concludes that the parties are "unable to agree." Admission Agreement ¶ D, at 14. The parties have offered no evidence depicting what they understand "unable to agree" to mean. Admission Agreement ¶ D, at 14. See, e.g., Mark V. Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 ("New Mexico law . . . allows the court to consider extrinsic evidence to make a preliminary finding on the question of ambiguity."); id., 1993-NMSC-001, ¶ 13, 845 P.2d at 1236 (permitting courts to consider "extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent" when a contractual term is ambiguous). The facts, nevertheless, illustrate a continuing disagreement here. After over six months, the parties remain gridlocked over the arbitrator. See Motion at 2; Reply at 1. Although Good Samaritan contends in its Response that the parties could yet agree, see Response at 1, the briefings, hearings, and notices, compare Motion at 1-2, with Response at 1-2; compare Hatton List at 1-2, with Good Samaritan List at 1, convince the Court that, at the hearing, Hatton accurately characterized the

situation as a "standstill," Tr. at 3:22 (Freeland). The parties' proposed arbitrators do not overlap, and Good Samaritan did not dispute Hatton's characterization of the situation at the hearing. Compare Hatton List at 1-2, with Good Samaritan List at 1. The Admission Agreement's paragraph D, therefore, applies. The paragraph provides no "method" outside of the court for appointing arbitrators, so the first criteria in § 5 is met. 9 U.S.C. § 5. See Admission Agreement ¶ D, at 14.

Moreover, the parties have reached an "impasse" that amounts to a "lapse in the naming of an arbitrator." 9 U.S.C. § 5. See Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp., 814 F.2d 1324, 1329 (9th Cir. 1987)(affirming a district court's decision to appoint an arbitrator after "five months of impasse"). As described in the paragraph above, after over six months, the parties cannot agree to an arbitrator, and neither party will move to accommodate the other party's proposals. The Court, therefore, concludes that this situation qualifies as a scenario listed in § 5.

Second, the parties have applied to the Court to appoint an arbitrator. See 9 U.S.C. § 5. In the Motion, Hatton sought the Court's assistance. See Motion at 1-2. Then, at the hearing, Good Samaritan and Hatton agreed to have the Court appoint an arbitrator. See Tr. at 14:18-21 (Harrison, Freeland, Court). Accordingly, the Court may and should exercise its authority under § 5.

The Court is convinced that the parties could not go wrong with any of the six proposed arbitrators. The Court knows all well and has a high professional regard for them. They all would do an outstanding job for the parties. Four are former judges. Three are former friends or colleagues.

While the Court knows that Mr. Hall and Mr. Madison could make findings of fact as well as judges and former judges, the Court will respect Good Samaritan's wishes to have a former judge. The Court appreciates that this dispute will be arbitrated and not meditated. While Mr. Hall and Mr. Madison certainly could do the later, Good Samaritan is probably right that they, as present trial attorneys and outstanding lawyers, have not done as many findings of fact and conclusions of law as the other four former judges. The Court will therefore, as a concession to Good Samaritan's wishes, choose an arbitrator from among the former judges.

From among the four former judges, the Court will appoint Judge Hall arbitrator in this matter. The Court weighs heavily that both parties at one point expressed satisfaction with Judge Hall. See Response at 2; Tr. at 6:21 (Freeland). Judge Hall will arbitrate -- not mediate -- although he is capable of both. See Response at 2. He is a prior judge, with considerable experience finding facts, reaching conclusions of law, and deciding cases on their merits, as Good Samaritan requests. See Response at 2; Tr. at 7:11-24 (Harrison). Although Good Samaritan has raised opposition to Judge Hall, see Tr. at 6:9 (Harrison), Judge Hall is experienced and professional. He is seasoned. The Court is certain that Judge Hall will not allow Good Samaritan's other arbitration before him to influence his conduct in this matter. As a former judge, Judge Hall knows to compartmentalize the cases, facts, and law before him. Every judge has repeat customers. While the Court is sensitive to Good Samaritan's desire to have a clean slate -- particularly if the first arbitration before Judge Hall has bad facts or exactly the same witnesses -- the Court thinks that Good Samaritan's fear of a problem is greater than any possible problem. Judges learn to -- and must take on oath to -- treat all parties fairly in the case before them -- not worrying what the parties did in another case. Judges try hard not to let other hearings or experience influence them in the case

before them. Unfavorable facts in one arbitration should not influence Judge Hall's opinion about another arbitration. Further, an experienced trial judge like Judge Hall has the shrewdness, wisdom, and intellectual firepower to avoid confusing the cases or mixing the evidence, as Good Samaritan worries. See Tr. at 6:14-17 (Harrison).

There are other reasons that Judge Hall makes a good arbitrator for the case. While the three federal judges all confronted diversity cases and decided many state law issues, Judge Hall, as a state judge, probably decided more state law issues than the federal judges, who had to address a great deal of federal law, and, in New Mexico, of federal criminal law. Also, the bar might be surprised how rare the bench trial is in New Mexico federal court. Most people want a jury here. While federal district judges and magistrate judges do a lot of hearings that require findings of fact and conclusions of law, Judge Hill probably has more experience doing findings of fact and conclusions of law on state law cases and in bench trials than the federal judiciary. The Court hired Judge Hall when the Court and Judge Hall were young lawyers in the Office of the Attorney General for the State of New Mexico. The Court appeared before Judge Hall as a lawyer. Although the Court developed many of its practices because it appeared before judges who the Court said it would try not to imitate, Judge Hall is one of the very few judges who the Court has tried to emulate and from whom the Court has borrowed practices. Judge Hall will serve the parties well as arbitrator in this case. Accordingly, the Court will appoint Judge Hall as the arbitrator.

**IT IS ORDERED** that: (i) the Defendant's Motion for Appointment of a Neutral Arbitrator, filed June 7, 2018 (Doc. 20), is granted in part and denied in part; and (ii) the Honorable James Hall, former state District Judge for the First Judicial District of the State of New Mexico, shall arbitrate this matter.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Martha G. Brown
Deana M. Bennett
Zoe E. Lees
Jeremy K. Harrison
Modrall, Sperling, Roehl, Harris & Sisk, PA
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Mary Ellen Reilly
Wayne T. Freeland
Wilkes & McHugh, P.A.
Phoenix, Arizona

*Attorneys for the Defendant*